Sonja **WATTS–MEANS,**
Plaintiff–Appellant,

v.

**PRINCE GEORGE'S FAMILY CRISIS CENTER, Defendant–Appellee (Two Cases).**

Sonja **WATTS–MEANS,**
Plaintiff–Appellee,

v.

**PRINCE GEORGE'S FAMILY CRISIS CENTER, Defendant–Appellant.**

**Nos. 92–2476, 92–2553 and 92–2603.**

United States Court of Appeals,
Fourth Circuit.

Argued June 9, 1993.

Decided Sept. 15, 1993.

Brenda C. Wagner, Wagner & Lewis, Washington, DC, argued for appellant.

James E. McCollum, Jr., College Park, MD, argued for appellee.

Before RUSSELL, Circuit Judge, ANDERSON, United States District Judge for the District of South Carolina, sitting by designation, and WILLIAMS, Senior United States District Judge for the District of Virginia, sitting by designation.

## OPINION

RICHARD L. WILLIAMS, Senior District Judge:

Sonja Watts–Means appeals the district court's refusal to allow her to amend her complaint in her action against her former employer, Family Crisis Center, Inc. of Prince George's County (the Center), and the district court's dismissal of her claims. We find no error in the district court's actions and affirm.

### I

The Center is a private non-profit corporation in Prince George's County, Maryland (the County), that was established to provide shelter and supportive services for victims of domestic violence. During the relevant period for this action, its board of directors had twenty-one voting members, twenty of whom were private individuals and one of whom served in his capacity as a County official. The Center's only other substantial connections with the County were that it occupied a building owned by the County and was re-quired to pay little or no rent, it received some financial support from the County, and its utilities costs were paid for by the County. None of the Center's employees or management personnel were government employees.

Watts–Means was employed by the Center in August, 1986. In February, 1987, the Center's assistant director in an "employee evaluation report" described Watt–Means' job performance as deficient and recommended that she be terminated. The Center's executive director agreed and terminated Watts–Means. The termination decision was reviewed and affirmed by a committee of the Center's board of directors.

Watts–Means filed Title VII charges with the Equal Employment Opportunity Commission (EEOC), but the EEOC determined that her termination had not been unlawful. The EEOC sent Watts–Means notification of its determination, in what is termed a "right-to-sue" letter, by certified mail on March 18, 1988. The Postal Service attempted to deliver the letter to her on March 21, 1988, and not finding her home, left a slip of paper indicating that she should pick up the letter at the post office. Although she suspected that the letter was from the EEOC, she did not pick it up until March 26, 1988.

On June 24, 1988, Watts–Means filed Title VII claims in the District of Maryland. Three and a half years later, she sought to amend her complaint to add claims under 42 U.S.C. § 1983, for violation of the Fourteenth Amendment, and under state law, for wrongful discharge and defamation. The district court allowed Watts–Means to add the wrongful discharge and defamation claims but refused to allow the section 1983 claim on the ground that it was futile because the Center had not acted under color of law.

The district court then dismissed Watts–Means' action, finding that her Title VII claims were not timely filed and that it had no pendent jurisdiction over her remaining state law claims for wrongful discharge and defamation because no federal claims remained in her action.

## II

■ We first address whether the district court erred in holding that Watts–Means' Title VII claims were not timely filed. We conclude that it did not.

Title VII plaintiffs have a ninety-day period in which to file their claims after the EEOC has given them a right-to-sue letter. 42 U.S.C. § 2000e–5(f)(1). Watts–Means filed her Title VII claims within ninety days of when she picked up her right-to-sue letter at the post office, but not within ninety days of when the Postal Service delivered notice to her that she could pick up the letter. At issue, therefore, is whether the Postal Service's delivery of this notice to Watts–Means triggered the limitations period.

We are of the opinion that it did. This Court held in *Harvey v. City of New Bern Police Dept.*, 813 F.2d 652 (4th Cir.1987), that delivery of a right-to-sue letter to a plaintiff's home triggers the limitations period even if the plaintiff does not actually receive the letter. *Harvey*, 813 F.2d at 654. It justified its holding on the grounds, first, that requiring "actual receipt" to trigger the period would allow some plaintiffs "open-ended time extension, subject to manipulation at will," and, second, that any injustices created by the rule could be remedied by equitable tolling. *Id.*

These same considerations persuade us to find that the limitations period is triggered when the Postal Service delivers notice to a plaintiff that the right-to-sue letter is available for pickup, and not when the letter is actually picked up. Requiring actual pickup to trigger the period would allow for the same manipulation of the limitations period that concerned the Court in *Harvey*.[1] Moreover, if triggering the period when the plaintiff receives notice of the letter would result in injustice, for example if the plaintiff was unaware that the letter about which he received notice was a right-to-sue letter and he was greatly delayed in picking it up, equitable tolling of the limitations period is available.

Because we find that the limitations period in this case was triggered on March 21, 1988, when Watts–Means received her notice that she could pick up a letter at the post office, we hold that her filing of her Title VII claims on June 24, 1988, was not within the limitations period.

■ Equitable tolling of the filing period was not appropriate here.[2] When Watts–Means received notice from the Postal Service of a letter, she suspected that it was from the EEOC. At that point, she had the full ninety-day limitations period to file her claims. Even if she did not actually know that her right-to-sue letter had arrived until she picked up the letter at the post office five days later, she still had eighty-five days from then to file her claims. In *Harvey*, this Court found equitable tolling inappropriate when the plaintiff did not receive notice of his right to sue until six days after the limitations period began because he still had eighty-four days to file his claim. *Id.* We, therefore, find no injustice here in triggering the limitations period when Watts–Means received notice of the letter from the Postal Service. Because Watts–Means did not file her Title VII claims within the limitations period and equitable tolling was not appropriate, we conclude that the district court did not err in dismissing Watts–Means' Title VII claims as untimely filed.[3]

## III

■ The only other issue raised by Watts–Means that merits even brief discussion is whether the district court erred in denying

1. This concern is particularly acute in the present case because Watts–Means suspected that the letter about which she received notice from the Postal Service was a letter from the EEOC. If the limitations period was not triggered until she picked up the letter, she conceivably could have tolled the period for as long as she chose simply by not picking up the letter.

2. Indeed, Watts–Means does not even argue that equitable tolling of the filing period was appropriate.

3. The Center also argues that even if the Title VII claims were timely filed, the panel should affirm their dismissal because the Center was not in an industry affecting commerce, as Title VII requires. Because the claims were correctly dismissed as untimely filed, we find it unnecessary to reach the Center's argument.

her leave to amend her complaint by adding a claim that her termination violated section 1983.[4] The district court refused to allow the amendment on the ground that the section 1983 claim was futile, *see Johnson v. Oroweat Foods Co.,* 785 F.2d 503, 510 (4th Cir.1986), as Watts–Means could not show that the Center acted under color of law. We agree.

An action of a private actor like the Center can constitute action under color of law in only four instances: (1) when the action is coerced by the state; (2) when the state has delegated to the private actor a responsibility that it has a constitutional duty to perform; (3) when the state has delegated to the private actor a traditionally and exclusively public function; or (4) when the state assists a private actor in enforcing the private actor's rights.[5] *Andrews v. Federal Home Loan Bank of Atlanta,* 998 F.2d 214, 217 (4th Cir.1993). Watts–Means' only conceivable argument that the Center acted under color of law in terminating her is that its action was "coerced" by the County. As evidence of coercion, she points to the facts, first, that at the time of her termination the County provided financial support for the Center in the form of paying for its utilities, allowing it to use a government building for little or no rent, and giving it monetary grants, and, second, that a County official, acting in his official capacity, served on the Center's board of directors.

We reject this argument. That the County provided financial support to the Center is not sufficient to render the Center's termination of Watts–Means an action that was coerced by the County. *See Rendell–Baker,* 457 U.S. at 840, 102 S.Ct. at 2770; *Blum v.*

*Yaretsky,* 457 U.S. 991, 1011, 102 S.Ct. 2777, 2789, 73 L.Ed.2d 534 (1982). Nor is the fact that the County had a representative on the Center's board of directors. The board had nothing to do with the termination decision itself. The most that can be said is that the board, acting through one of its committees, reviewed the decision. This falls far short of being a situation in which state coercion or control could be found. *See Andrews,* at 217. And even if the board was responsible for the termination decision itself, the County, through its voting board member, could not have controlled or coerced this decision because it had only one of twenty-one total votes on the board. *See National Collegiate Athletic Ass'n v. Tarkanian,* 488 U.S. 179, 193, 109 S.Ct. 454, 462, 102 L.Ed.2d 469 (1988); *Arlosoroff v. National Collegiate Athletic Ass'n,* 746 F.2d 1019, 1022 (4th Cir. 1984).[6]

Because it would be impossible for Watts–Means to show that the Center acted under color of law in terminating her, we agree with the district court that Watts–Means' section 1983 claim was futile and find no error in its refusal to allow her to add this claim to her complaint.

## IV

For the reasons set forth, we affirm both the district court's refusal to allow Watts–Means to amend her complaint and its dismissal of her claims.

*AFFIRMED.*

---

4. Watts–Means makes several additional arguments as well, but we find that they are without merit and reject them without discussion.

5. "In cases under section 1983, 'under color' of law has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment." *Rendell–Baker v. Kohn,* 457 U.S. 830, 838, 102 S.Ct. 2764, 2769, 73 L.Ed.2d 418 (1982) (quoting *United States v. Price,* 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 1157 n. 7, 16 L.Ed.2d 267 (1966)). As a result, in this analysis, we use cases defining "state action" interchangeably with those interpreting "under color" of law.

6. Watts–Means places great emphasis on *Burton v. Wilmington Parking Authority,* 365 U.S. 715,

81 S.Ct. 856, 6 L.Ed.2d 45 (1961), but *Burton* is easily distinguishable. *Burton* involved a state agency that owned a building out of which it operated a parking garage. The agency leased space in the building to a restaurant that discriminated against blacks. The Court held that the restaurant's discrimination was state action because "the State ha[d] so far insinuated itself into a position of interdependence with [the restaurant] that it [had to] be recognized as a joint participant in the challenged activity." *Burton,* 365 U.S. at 725, 81 S.Ct. at 862. Prince George's County has not entered into the same type of joint venture with the Center that was at issue in *Burton.*