The WILSON GROUP, INC., Plaintiff,

v.

QUORUM HEALTH RESOURCES, INC., successor to HCA Management Company, Inc., and Hospital Corporation of America, Defendants.

Civ. A. No. 4:93–2768–22.

United States District Court,
D. South Carolina,
Florence Division.

March 21, 1995.

***

**420**

Saunders McKenzie Bridges, Lawrence B. Orr, Julie Berly Ervin, Bridges, Orr, Derrick & Ervin, Florence, SC, for plaintiff.

Stuart M. Andrews, Jr., Daniel J. Westbrook, Jonathon P. Dyer, Nelson Mullins Riley & Scarborough, L.L., Columbia, SC, for defendant.

## ORDER

CURRIE, District Judge.

This is an action based on three causes of action: (1) breach of contract; (2) breach of contract accompanied by fraudulent act; and (3) Unfair Trade Practices Act ("UTPA") violations, S.C.Code Ann. §§ 39–5–10 *et seq.* The matter is before the court on (1) Defendant Quorum Health Resources, Inc.'s (hereinafter "Quorum") Motion for Partial Summary Judgment, (2) Defendant Hospital Corporation of America's (hereinafter "HCA") Motion for Summary Judgment, and (3) Plaintiff The Wilson Group, Inc.'s (hereinafter "Wilson Group") Motion to Amend Complaint. On July 20, 1994, both Defendants filed motions for summary judgment. The court heard oral argument on the motions for summary judgment on September 27, 1994, and took the motions under advisement. On November 14, 1994, Wilson Group filed a motion to amend the complaint to allege a negligence cause of action against Quorum for matters arising from November 12, 1991 forward. For the reasons set forth below, the court: (1) grants in part and denies in part Quorum's Motion for Partial Summary Judgment; (2) grants in part and denies in part HCA's Motion for Summary Judgment; and (3) denies Wilson Group's Motion to Amend Complaint.

## I. SUMMARY JUDGMENT STANDARD

In deciding a summary judgment motion, the court must look beyond the pleadings and determine whether there is a genuine need for trial. *Matsushita Electric Industrial Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Ins.,* 477 U.S. 242, 251–53, 106 S.Ct. 2505, 2511–13, 91 L.Ed.2d 202 (1986). If Defendants carry their burden of showing there is an absence of evidence to support a claim, then Plaintiff must demonstrate by affidavits, depositions, answers to interrogatories or admissions on file that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324–25, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). An issue of fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for Plaintiff. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. An issue of fact concerns "material" facts only if establishment of the fact might affect the outcome of the lawsuit under governing substantive law. *Id.* A complete failure of proof concerning an essential element of a cause of action necessarily renders all other facts immaterial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53. Moreover, production of a "mere scintilla of evidence" in support of an essential element will not forestall summary judgment. *Anderson,* 477 U.S. at 251, 106 S.Ct. at 2511–12.

In other words, summary judgment should be granted in those cases in which it is perfectly clear that no genuine issue of material fact remains unresolved and inquiry into the facts is unnecessary to clarify the application of the law. *McKinney v. Bd. of Trustees,* 955 F.2d 924, 928 (4th Cir.1992); *Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th Cir.1979). In making its determination under this standard, this court must draw all permissible inferences from the underlying facts in the light most favorable to Plaintiffs. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88,

106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986); *McKinney*, 955 F.2d at 928.

## II. FACTUAL BACKGROUND

The following factual background is based on the current record before this court for purposes of summary judgment drawing all permissible inferences from the record in the light most favorable to Plaintiff.

This action arises out of a twelve-year contractual relationship between Wilson Group and Defendants. Wilson Group is a South Carolina corporation that owns and operates hospitals and clinics in South Carolina. Defendant Quorum is a Delaware corporation with its principal place of business in Tennessee and Defendant HCA is a Tennessee corporation with its principal place of business in Tennessee.

Wilson Group and Quorum began their contractual relationship on October 1, 1980 when they signed a five-year management agreement in which Quorum undertook to manage Wilson Groups' facilities.[1] HCA signed the agreement as guarantor.[2] On October 1, 1985, Wilson Group and Quorum entered into another five-year management agreement in which Quorum again undertook to manage Wilson Group's facilities.[3] HCA was not a party to this agreement.

In a letter dated June 13, 1986, John L. Wilson, Executive Director of Wilson Clinic and Hospital[4], wrote to Mr. Creighton Likes at Quorum:

As we have stated in the past, it is essential that Wilson [Group] and [Quorum] work very closely together to operate [the Wilson facilities] to our best possible advantage. The difficulties of an operation this size are great. The expertise required to run it obvious. This is the reason [Quorum] is here.

\* \* \* \* \* \*

[Wilson Group] feel strongly that revenue ... is being lost. These have been brought up in the past to the [Quorum] people at our hospital. We will discuss specifics at our next Executive Committee on June 24. It is our intention as a small privately owned business to maximize revenue and remain a top-notch ethical operation. This is not being done.

[Quorum] is your company and the focal point of your career. Wilson ... is mine. Through the management contract, Wilson ... must also be yours. During this period of transition with your leaving the Charlotte office, our receiving an excellent controller, and the other things which are always in a state of change, it is imperative that full support be given to us not only on the big issues, but the details as well....

As you well know, a hospital which is making a profit does not have the complaints which an unprofitable hospital has. We are in that area of unprofitability and attribute part of it to forces beyond our control. The other part, over which we do have control, is that which we are depending on you and [Quorum] for innovation, management and air tight control.

We are planning to use the June Executive Committee meeting to discuss this further. We also plan to let this be a starting point of unparalleled efficiency and profit maximization. It is important that everyone involve realize this and be prepared to do everything possible to achieve this end. There is no other way to approach this.

---

1. The October 1, 1980 agreement was actually between Wilson Clinic & Hospital, Wilson Outpatient Clinic, P.A., Oakhaven, Inc., and Darlington Convalescent Center and HCA Management Company, Inc. Wilson Group is the successor to and parent corporation of the first four parties to the agreement. Quorum is the successor to HCA Management Company, Inc.

 To simplify matters, for purposes of this order, whenever possible the court will refer to Plaintiff and its predecessors and subsidiaries as "Wilson Group" and HCA Management Company, Inc. and Quorum Health Resources, Inc. as "Quorum."

2. HCA was the parent corporation of Quorum's predecessor, HCA Management Company, Inc.

3. The October 1, 1985 agreement was actually between Plaintiff Wilson Group, Inc. and HCA Management Company, Inc., Quorum's predecessor. The agreement called for HCA Management Company, Inc. to manage Wilson Clinic & Hospital, Inc., Oakhaven, Inc., Wilson Realty, Inc. (Darlington Convalescent Center), Wilson Medical Supply, Inc., and the Wilson Clinic, P.A.

4. He is also the son of Wilson Group's founder, Dr. John M. Wilson, M.D.

At the June 24, 1986 Executive Committee meeting, Mr. Likes gave an overview of the financial status of Wilson Clinic and Hospital and reviewed recent activities designed to correct current problems. John L. Wilson noted the organization's need for continued efficiencies and additional growth. He also distributed an article regarding recent recognition that Quorum had received regarding their dynamic growth within the health care industry and noted the need for that same type of dynamic innovation within the Darlington, South Carolina community. A short discussion followed concerning billing and suggestions for improvement and increased collection of patient billings.

In November 1986, Wilson Group received its consolidated financial statements and schedules and auditors' report for the fiscal year ending September 30, 1986 from its accountant, Peat, Marwick, Mitchell & Co. The consolidated balance sheet showed the Wilson facilities' net accounts receivable to be $1,230,558. The accounts receivable for the previous fiscal year had been $1,266,725. The auditors' report did not indicate whether this amount of accounts receivable was unusual.

At the November 25, 1986 Executive Committee meeting, James Worrell, Quorum's new financial controller of Wilson Group facilities, presented the Controller's Report. Mr. Worrell noted "that all facilities were doing well for the first month of the new fiscal year, showing good overall utilization trends and strong financial results." At the following month's Executive meeting, Mr. Worrell gave his report, noting that "bad debt appears to be moderating, giving the hospital a positive variance with respect to budgeted net income."

Due to the large accumulation and age of Wilson Group's accounts receivable, Quorum retained Ray Jordan, an external consultant. Mr. Jordan was to analyze the accounts receivable and determine how to improve collection efforts. There is no indication that Wilson Group requested that Mr. Jordan be retained. Wilson Group, however, had begun an in-house collection service at the Wilson Clinic and Hospital a few months earlier.

The next significant series of events between Wilson Group and Quorum began in 1990. At the July 1990 Executive Committee meeting, Mr. Worrell gave the Controller's Report noting that "utilization continued to be strong throughout the organization and that the operating results reflected this fact. He expressed optimism for the projected 1990 fiscal year end operating results." At the August, 1990 Executive Committee meeting, Mr. Worrell again gave the Controller's Report noting that "accounts receivable were being worked aggressively throughout the organization."

In September 1990, Mr. Worrell disclosed to John L. Wilson that he was having vendors' checks held. In December 1990, Mr. Worrell informed John L. Wilson that he had not paid FICA, FIT, and SIT taxes due from Wilson Group. At the April 1991 Executive Committee meeting, Dick Reif, Vice President of Quorum "stated that he was unaware of unpaid payroll taxes until February, 1991." In March, 1991, Ruth McDaniel was sent by Quorum to replace Jim Zager as Administrator at Wilson.

In a letter dated May 8, 1991, John L. Wilson wrote to John Shea, Regional Vice President of Quorum, expressing serious concerns about Quorum's performance in managing the Wilson Group facilities. Wilson noted that "our organization is suffering because of two primary reasons, one self inflicted, one Quorum management inflicted." Wilson stated that "our organization has been neglected over the last 18 or more months by your Charlotte office." He further noted: "A less understanding client would have fired Quorum for the reasons we're continuing to discuss. An unreasonable client would probably seek a judicial remedy."

In a letter dated September 10, 1991, James G. Stokes, Regional Vice President of Quorum, assured Dr. John Wilson that he took very seriously Wilson Group's concerns about Quorum's support and management. He stated that he was prepared to work hard at overcoming the past concerns of Wilson Group and place the Wilson Group and Quorum relationship on the right track to make Wilson Group successful in the future.

Quorum brought in consultants to evaluate the problems and recommend improvements in Wilson's operations. In October 1991, Quorum sent six different consulting teams to Wilson for thirteen days. Wilson Group could have reasonably believed that this activity would improve the alleged problems caused by both Quorum and Wilson Group.

On November 12, 1991, Wilson Group and Quorum entered into a three-year management agreement in which Quorum again undertook to manage Wilson Group's facilities.[5] Both parties were represented by counsel. HCA was not a party to this agreement. The 1991 management agreement contained the following provision:

5. MANAGEMENT FEE

(d) *Outstanding Debt to Quorum.* Wilson acknowledges that it has accrued a debt to Quorum which is comprised of overdue management fees and reimbursable salary and benefit expenses which were due prior to August 31, 1991 under the Management Agreement between Wilson and HCA Management Company, Inc. (Quorum's former name) which was in effect at that time (the Prior Management Agreement). The amount of overdue management fees is $102,244.70, and the amount of overdue reimbursable expenses is $110,148.09. Quorum has agreed to compromise and settle this debt in return for payment in full of the reimbursable expenses.

The parties therefore agree that Wilson will use its best efforts to pay the sum of $110,148.09, without interest, no later than January 31, 1992; and the parties further agree that, if such sum is not paid by January 31, 1992, excess cash generated from the operation of the Hospital will be applied to pay off this debt to Quorum as quickly as possible thereafter. Upon payment of this compromise figure, Wilson shall have no further obligation to pay management fees and reimbursable expenses under the Prior Management Agreement, Wilson and Quorum will both

be deemed to have performed their obligations under the Prior Management Agreement, and neither party shall have any further obligation under the Prior Management Agreement except as expressly set forth therein.

At the end of 1991 and the beginning of 1992, Ruth McDaniel, the Quorum Administrator for Wilson Group, revealed that recommendations made by Quorum's consultants had not been implemented and problems were still being uncovered. She assured Wilson Group that she would work hard to resolve these problems. Wilson Group believed Ms. McDaniel was working to resolve these problems.

At the end of 1991, Ms. McDaniel came to Dr. John M. Wilson, M.D. and offered to help Wilson Group sue Quorum. Dr. Wilson informed Quorum of this development. Wilson Group and Quorum agreed that Ms. McDaniel must be removed.

Quorum continued to manage Wilson Group's facilities through 1992. In a letter dated September 3, 1992, Dr. John M. Wilson sent Quorum a notice of alleged breach of the 1991 management agreement and gave Quorum 60 days to cure the problem.

This action was filed September 16, 1993 in the Court of Common Pleas for Darlington County. The complaint was served on September 20, 1993. Defendants removed the action to this court October 20, 1993.

### III. SUMMARY JUDGMENT ANALYSIS

### A. QUORUM'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Quorum moves for partial summary judgment on the three grounds: (1) the statute of limitations bars Wilson Group from recovering for any alleged breach of contract that occurred before September 20, 1987, and any alleged breach of contract that occurred between April 5, 1988 and September 20, 1990; (2) Wilson Group has released all claims it may have had against Quorum arising out of the October 1, 1985 management agreement;

---

**5.** Between October 1, 1991 and November 12, 1991, Quorum operated Wilson Group's facilities under the 1985 management agreement pursuant to an automatic renewal provision that extended

the agreement by one year if neither party notified the other within 90 days of expiration that it did not wish to renew the agreement.

and (3) Wilson Group has failed to allege or set forth facts to support its cause of action for UTPA violations against Quorum.

## 1. STATUTE OF LIMITATIONS

Quorum argues that the applicable statute of limitations bars Wilson Group from recovering under its first two causes of action, breach of contract and breach of contract accompanied by fraudulent act, for breaches before September 20, 1987 or between April 5, 1988 and September 20, 1990. This argument is premised on Quorum's contention that Wilson Group, as a matter of law, knew or reasonably should have known of Quorum's alleged breaches before September 20, 1987, or September 20, 1990. This argument fails.

■ For Quorum to prevail on its statute of limitations argument at the summary judgment stage, it has the burden of proving that the claims fall outside the applicable limitations period. *Creech v. N.D.T. Industries, Inc.*, 815 F.Supp. 165, 167 (D.S.C.1993).

■ The statute of limitations for Wilson Group's first two causes of action is six years from the date of filing for breaches that occurred before April 5, 1988, and three years from the date of filing for breaches that occurred on or after April 5, 1988. S.C.Code Ann. § 15–3–530 (Law.Co-op. 1976 & Supp.1993). Because of the effective date of § 15–3–530, April 5, 1988, contract claims arising before that date can be brought within six years, but claims arising after that date must be brought within three years.[6] The limitations period, however, may be extended by the "discovery rule." *Santee Portland Cement Co. v. Daniel Int'l Corp.*, 299 S.C. 269, 384 S.E.2d 693 (1989); S.C.Code Ann. § 15–3–530(7) (Law.Co-op. 1976 & Supp. 1993). Under the "discovery rule," causes of action for breach of contract do not accrue

until a plaintiff knows or reasonably should know a breach has occurred. Therefore, to prevail on its statute of limitations argument Quorum must show, as a matter of law, Wilson Group knew or reasonably should have known of Quorum's alleged breaches before September 20, 1987, or September 20, 1990.[7]

■ Viewing the facts and all reasonable inferences in the light most favorable to Wilson Group, the court cannot say as a matter of law that Wilson Group knew or reasonably should have known of Quorum's alleged breaches before September 20, 1987, or September 20, 1990. It is true, as described above, that there were many discussions and correspondence between Wilson Group and Quorum regarding Quorum's management of Wilson Group's facilities. These discussions and correspondence began by June 1986. On one hand, they could be described as constructive communication aimed at solving the mutual problems confronting both parties in operating the Wilson Group's facilities. Because Wilson Group complained about Quorum's operation of its facilities does not necessarily lead to the conclusion that Wilson Group knew Quorum had allegedly breached its contract. On the other hand, the discussions and correspondence might demonstrate that Wilson Group knew or reasonably should have known of the alleged breaches before September 20, 1987, or September 20, 1990. Not until the May 8, 1991 letter is it clear, as a matter of law, that Wilson Group discovered or reasonably should have discovered the alleged breaches. This case presents the typical situation where determining whether the discovery rule will relieve a plaintiff from the operation of the statute of limitations is a question for the jury. Therefore, Quorum's Motion for Partial Summary

---

**6.** Although a cause of action for breach of contract accompanied by a fraudulent act has elements of contract and tort, it is considered contractual in nature. *Peeples v. Orkin Exterminating Co.*, 244 S.C. 173, 135 S.E.2d 845, 847 (1964). Therefore, Wilson Group's cause of action for breach of contract accompanied by a fraudulent act is governed by the limitations period for contract actions.

**7.** A federal court sitting in diversity must apply state law to determine when an action is commenced for purposes of a state statute of limitations. *Wolfberg v. Greenwood Development Corp.*, 868 F.Supp. 132, 134 (D.S.C.1994). Rule 3, South Carolina Rules of Civil Procedure, requires service of process to commence an action. The complaint was served on September 20, 1993.

Judgment as it relates to the statute of limitations is denied.[8]

## 2. RELEASE

Quorum next argues that Wilson Group released all claims it may have had against Quorum arising out of the October 1, 1985 management agreement when it signed the November 12, 1991 management agreement. The court agrees.

■■■■ A release is the relinquishment of a right or claim by the person in whom the right exists to the person against whom it might have been enforced. 18 S.C.Juris. Release § 2. A release is a specific type of contract and governed by the same principles of interpretation as other contracts. *Cf. Lowery v. Callahan,* 210 S.C. 300, 42 S.E.2d 457, 458 (1947) (noting that same principles of adequacy of consideration govern contracts and releases). "No set form of words is necessary to constitute a release." *Gardner v. City of Columbia Police Dept.,* 216 S.C. 219, 57 S.E.2d 308, 310 (1950). Pursuant to the general rule, particular words and expressions in releases are given their ordinary meanings, unless the context indicates their use in a different sense. *Id.* 57 S.E.2d at 309. The construction of a release is, in the first instance, a question of law for the court. In construing the release, the court must seek to ascertain and give effect to the intention of the parties. In determining the nature of the release, the court must first look to the instrument itself. *Campbell v. Bi–Lo, Inc.,* 301 S.C. 448, 392 S.E.2d 477, 479 (Ct.App.1990) (citations omitted).

In this case, the meaning of the release contained in the November 12, 1991 management agreement is clear and unambiguous. Wilson Group owed Quorum over $212,000.00 in past fees and expenses. By the plain language of Section 5(d), Quorum agreed to forgive over $102,000.00 in overdue fees and interest on more than $110,000.00 in overdue expenses in exchange for release from any liability under the October 1, 1985 management agreement.

Wilson Group raises several arguments it contends demonstrate that Section 5(d) does not release all of Wilson Group's claims against Quorum arising out of the October 1, 1985 management agreement. These arguments fail.

■■■■ First, Wilson Group contends that Quorum failed to plead release as an affirmative defense as required by Fed. R.Civ.P. 8(c). Quorum's Answer, however, states that Wilson Group's claims arising from any agreement between the parties entered into prior to November 12, 1991 "are barred because of the waiver in the [November 12, 1991 management] agreement." Quorum's Answer at ¶ 14. The purpose of Rule 8(c) is to ensure that a plaintiff has adequate notice of affirmative defenses. *Blonder–Tongue Lab., Inc. v. University of Illinois Found.,* 402 U.S. 313, 350, 91 S.Ct. 1434, 1453–54, 28 L.Ed.2d 788 (1971). Paragraph 14 accomplishes that purposes.

Second, Wilson Group contends that the plain and ordinary meaning of Section 5(d) does not establish a release. Wilson notes that (1) the release is contained under the headings "Management Fee" and "Outstanding Debt to Quorum"; (2) the terms "release" and "discharge" are not contained in Section 5(d); and (3) the release states that "neither party shall have any further obligation under the Prior Management Agreement *except as expressly set forth therein.*"

■■■■ Whether a release is unambiguous is a matter of law for the court to decide. *Campbell,* 392 S.E.2d at 479. A release is ambiguous only when it may fairly and reasonably be understood in more than one way. *See Far v. Duke Power Co.,* 265 S.C. 356, 218 S.E.2d 431, 433–34 (1975). As to the headings, Section 19(a) of the 1991 management agreement states that "[s]ection headings are for convenience of reference only and shall not be used to construe the meaning of any provision of this Agreement." As to the argument that the terms "release" and "discharge" are not used, South Carolina law is clear that no "magic" words are necessary to create a valid release. *Gardner,* 57 S.E.2d at

---

**8.** Because of the court's ruling, it need not address Wilson Group's argument that Quorum should be estopped from asserting the statute of limitations under *Dillon School Dist. v. Lewis Sheet Metal Works, Inc.,* 286 S.C. 207, 332 S.E.2d 555 (Ct.App.1985).

310. Because the court finds Section 5(d) to be a clear and unambiguous release, Wilson Group's arguments concerning extrinsic evidence [9] and the rule of construction that ambiguities are to be construed against the drafter are inapplicable.[10]

 Finally, Wilson Group contends that the $102,000.00 debt forgiven in exchange for a release from liability that it contends is in excess of $3,000,000.00 is insufficient. This argument fails for two reasons. First, the amount of damages in this action is hotly contested. Second, when the consideration agreed upon for a release is something of value, courts generally will not avoid a release on the ground of inadequacy of consideration for the release because the contracting parties, not the court, must determine the quid pro quo. *Lowery*, 42 S.E.2d at 458. This rule has been held to apply even though the settlement is improvident, and even when the releasor was ignorant of his rights. *Id.* Therefore, the court grants Quorum's Motion for Partial Summary Judgment as to Wilson Group's release of all claims it may have had against Quorum arising out of the October 1, 1985 management agreement.

### 3. UTPA

Quorum next argues that Wilson Group has failed to allege or set forth facts to support its cause of action for UTPA violations against Quorum. The court agrees.

The UTPA provides that "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." S.C.Code Ann. § 39–5–20(a). The terms "trade" and "commerce" are defined by § 39–5–20(b) to include the sale of services.

The UTPA creates a private right of action in § 39–5–140(a):

"Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of an unfair or deceptive method, act or practice declared unlawful by § 39–5–20 may bring an action individually, but not in a representative capacity, to recover actual damages."

 In order to bring a cause of action under the UTPA, the alleged unfair acts or practices must adversely affect the public interest. *Florence Paper Co. v. Orphan,* 298 S.C. 210, 379 S.E.2d 289, 291 (1989); *LaMotte v. Punch Line of Columbia, Inc.,* 296 S.C. 66, 370 S.E.2d 711, 713 (1988); *Noack Enterprises, Inc. v. Country Corner Interiors of Hilton Head Island, Inc.,* 290 S.C. 475, 351 S.E.2d 347, 349–350 (Ct.App.1986). This public impact must be proven with specific facts that members of the public were adversely affected. *Daisy Outdoor Advertising Co. v. Abbott,* —— S.C. ——, 451 S.E.2d 394, 397 (Ct.App.1994); *Jefferies v. Phillips,* —— S.C. ——, 451 S.E.2d 21, 23 (Ct.App.1994) "An unfair or deceptive trade practice has an impact upon the public interest if it has the potential for repetition." *Haley Nursery Co. v. Forrest,* 298 S.C. 520, 381 S.E.2d 906, 908 (1989) (citing *Noack Enterprises, Inc.*). A deliberate or intentional breach of contract, without more, does not constitute a violation of the UTPA. *Ardis v. Cox,* —— S.C. ——, 431 S.E.2d 267, 271 (Ct.App.1993).

Quorum contends that Wilson Group's claim in essence is for breach of contract, an alleged private wrong between two private commercial entities that does not impact the public interest. Wilson Group responds that the alleged acts impact the public interest and are capable of repetition. Wilson Group puts forth several novel and creative argu-

---

**9.** Wilson Group argues its representatives who negotiated the 1991 management agreement did not intend to provide a general release.. This argument would fail for two reasons. First, the subjective intention of parties to a clear and unambiguous contract do not control its meaning. Any other principle would allow a party to avoid the legal effect of a release by claiming it did not believe it was releasing its rights. Second, both parties were represented by counsel in the negotiation of the release and are presumed

to understand its legal ramifications. *Somora v. Marriott Corp.,* 812 F.Supp. 917, 922–23 (D.Minn.1993).

**10.** The court also notes that this rule of construction is not automatically applied when there is no evidence of adhesion or unequal bargaining power. *Int'l Wood Processors v. Power Dry, Inc.,* 593 F.Supp. 710, 734 (D.S.C.1984) *aff'd,* 792 F.2d 416 (4th Cir.1986).

ments in an attempt to satisfy the public impact requirement. The court finds none of these persuasive.

■ Wilson Group first contends that Quorum filed Medicaid and Medicare claims that miscoded procedures and incorrectly used Dr. John Wilson's provider number even though the procedures were done by other doctors. Because Dr. Wilson was more experienced and reimbursed at a higher rate, Wilson Group was allegedly reimbursed at a higher rate than that to which it was entitled. Wilson Group also was allegedly reimbursed at a higher rate because of the miscoding. Wilson Group contends that these acts caused taxpayers to pay excessive claims. The court does not believe that Wilson Group is the appropriate party to seek recovery of possible injuries suffered by the taxpayers. "The UTPA limits recovery to persons who have suffered 'actual damages' and does not afford a right of action which is brought 'in a representative capacity.'" *Omni Outdoor Advertising, Inc. v. Columbia Outdoor Advertising, Inc.*, 974 F.2d 502, 507 (4th Cir. 1992) (citing S.C.Code Ann. § 39–5–140(a)). Wilson Group "cannot piggyback on injuries suffered by others." *Id.*[11]

■ Wilson Group next contends that Quorum deprived Wilson Group of revenues by miscoding and undercharging for medical procedures performed at Wilson Group.[12] Wilson Group asserts that because historically it has reinvested 100% of its net earnings to the operation and improvement of its facilities, Quorum's actions deprived patients of improved services. This argument fails for two reasons. First, the possible impact on the public is too attenuated. Anytime a business allegedly loses revenues the argument

can be made that the public is harmed through higher prices, etc. These potential public ramifications are too remote to satisfy the public impact requirement. *Omni Outdoor Advertising*, 974 F.2d at 507–08. Second, Wilson Group has failed to set forth specific facts to support a finding of impact on the public. There is nothing in the record that demonstrates that Wilson Group ever provided less than excellent care. Nor is there any evidence of record that the alleged loss of revenues caused a stagnation in Wilson Group's services.

■ Wilson Group's next argument concerning public impact is that Quorum failed to follow its own consultants' recommendations to improve billing practices and failed to properly train staff in billing procedures. Wilson Group contends that this caused patients to lose confidence in Wilson and caused Wilson to lose patients' business. However, Wilson Group failed to produce evidence that even a single patient lost confidence in Wilson Group due to its billing practices. Wilson Group also failed to produce any evidence that any alleged lost confidence caused Wilson Group to lose revenue.[13] Without proof of specific facts disclosing that any member of the public was adversely affected by Quorum's alleged actions, all that is left is a "'speculative [claim] of adverse of adverse public impact' and that will not suffice for a recovery under the UTPA." *Daisy Outdoor Advertising Co.*, 451 S.E.2d at 397 (quoting *Omni Outdoor Advertising, Inc.*, 974 F.2d at 507).

■ Finally, Wilson Group contends Quorum's alleged acts have the potential for repetition. Wilson Group argues that because several Quorum employees that were in-

---

11. Wilson Group also claims that Dr. Wilson is subject to possible "exposure for Quorum's filing of fraudulent claims." This assertion is sheer speculation and unsupported by affidavit.

12. This argument partially undercuts Wilson Group's contention that the public was hurt by Quorum's handling of Wilson Group's billings. If Quorum miscoded and undercharged for services, Wilson Group would not have been fully reimbursed by Medicare and Medicaid thereby saving taxpayers money. Furthermore, individual patients would have benefitted by being undercharged.

13. In support of this contention, Wilson Group cites to an article in JOURNAL OF HEALTHCARE MARKETING entitled "Do Patients Perceptions of Quality Relate to Hospital Financial Performance?" This article does not concern Wilson Group's facilities. Nor does it provide any evidence that Wilson Group patients knew of Wilson Group's alleged billing problems or that Wilson Group patients lost confidence in Wilson Group.

volved in the alleged acts involving Wilson Group still work for Quorum and because Quorum has over 180 contracts to manage hospitals across the United States, the potential for repetition exists.[14] This argument also fails. Faced with nearly the identical argument, the Court of Appeals of South Carolina recently noted: "In the course of human endeavor, every action has some potential for repetition. The mere proof that the actor is still alive and engaged in the same business is not sufficient to establish this element." *Jefferies*, 451 S.E.2d at 24. There is no evidence in this case of other similar acts and, therefore, no basis to conclude that Quorum's alleged acts have the potential for repetition.[15]

Wilson Group has failed to set forth specific facts to demonstrate that members of the public were adversely affected by Quorum's alleged acts. Furthermore, Wilson Group has failed to set forth facts showing a real potential for repetition. This action involves an alleged intentional breach of contract within a commercial setting. South Carolina courts have held such a breach is not a violation of the UTPA. *See e.g., Ardis*, 431 S.E.2d at 271. As the Fourth Circuit has reasoned:

> While every private dispute doubtless has remote public ramifications, these cannot be held to satisfy the element of injury to the public interest which is a prerequisite to any recovery under the UTPA. Were we to rule otherwise, every ordinary commercial dispute would become a candidate for the extraordinary remedies provided by the Act.

*Id.* at 507–08. Therefore, the court grants Quorum's Motion for Partial Summary Judg-

ment as to Wilson Group's cause of action for UTPA violations.

## B. HCA'S MOTION FOR SUMMARY JUDGMENT

HCA also moves for summary judgment, but only on two grounds: (1) the statute of limitations bars Wilson Group from recovering for any alleged breach of contract by HCA and (2) Wilson Group has failed to allege or set forth facts to support its cause of action for UTPA violations against HCA. For the same reasons noted above, the court denies HCA's Motion for Summary Judgment as to the statute of limitations and grants HCA's Motion for Summary Judgment as to Wilson Group's UTPA cause of action.[16]

## IV. MOTION TO AMEND

Rule 15(a) of the Federal Rules of Civil Procedure provides that after a responsive pleading has been served, "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." The United States Supreme Court has admonished that "this mandate is to be heeded." *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). In *Foman*, the Court stated,

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue

---

14. Wilson Group also claims Quorum sent a letter, news release, and question and answer packet to Dr. John Wilson that contained false information. Wilson Group failed to produce any evidence that this material was to be sent or ever was sent to any other Quorum customers.

15. In support of its argument regarding the potential for repetition, Wilson Group claims that Ruth McDaniel was transferred from a Quorum-managed Wyoming hospital to the Wilson Group facilities because of an alleged sexual harassment incident. The court finds this fact to be immaterial to the potential for repetition argument.

Even if true, this incident does not relate to the claims that Wilson Group makes in this action.

16. The court notes that HCA's only connection with this action is that it guaranteed the 1980 management agreement. Although Wilson Group alleged that HCA and Quorum are the "alter egos" of one another, it has produced no evidence that would justify piercing the corporate veil. *See e.g., DeWitt Truck Brokers v. W. Ray Flemming Fruit Co.*, 540 F.2d 681 (4th Cir.1976). Therefore, HCA's liability in this action is limited to its liability resulting from its role as guarantor of the 1980 management agreement.

prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given." Of course, the grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules.

Id. at 182, 83 S.Ct. at 230. In the present case, Defendants argue that the court should deny the proposed amendment because it is futile. Leave to amend should be denied on the ground of futility only when the proposed amendment is clearly insufficient because of substantive or procedural considerations. *Davis v. Piper Aircraft Corp.,* 615 F.2d 606, 613 (4th Cir.), *cert. dismissed,* 448 U.S. 911, 101 S.Ct. 25, 65 L.Ed.2d 1141 (1980); *See e.g., Watts–Means v. Prince George's Family Crisis Center,* 7 F.3d 40, 43 (4th Cir.1993) (upholding district court's refusal to allow amendment asserting § 1983 claim because plaintiff could not show defendant acted under color of law); *Frank M. McDermott, Ltd. v. Moretz,* 898 F.2d 418, 421 (4th Cir.1990) (upholding district court's refusal to allow amendment asserting fraudulent misrepresentation counterclaim because it would have been subject to dismissal under Rule 12(b)(6) ); *DeLoach v. Woodley,* 405 F.2d 496, 497 (5th Cir.1968). With these standards in mind, the court turns to the motion to amend of Wilson Group.

## V. MOTION TO AMEND ANALYSIS

Wilson Group seeks to amend the complaint to allege a negligence cause of action against Quorum for matters arising from November 12, 1991 forward. In the proposed amended complaint Wilson Group asserts that Quorum owed a duty of care to Wilson Group to use reasonable care in its management of Wilson Group's facilities. Wilson Group also asserts that Quorum had a duty to deal fairly and justly with Wilson Group in its operations of the facilities. Wilson Group alleges that Quorum breached its duty by failing to: (1) implement recommendations suggested by its consultants; (2) advise Wil-

son Group of its failure to implement the consultants' recommendations; (3) properly collect monies owed to Wilson Group; (4) maximize Wilson Group's profits; (5) inform Wilson Group that it was charging less than prevailing rates; (6) adequately train Wilson Group employees regarding proper coding of billing entries; (7) apply Medicare and Medicaid regulations to Wilson Group's advantage; (8) inform Wilson Group regarding business developments; and (9) provide appropriate and nondisruptive managers to operate Wilson Group's facilities. The court will not allow the proposed amendment because it would be futile.

■■■■■ The instant case involves three contracts for hospital management services between the parties. The duties alleged in Wilson Group's proposed negligence claim all arise from the management agreements. South Carolina law has long recognized the principle that no tort claim will lie when the parties' duties are defined by a contract. *See, e.g., Meddin v. Southern Ry.–Carolina Div.,* 218 S.C. 155, 62 S.E.2d 109, 112 (1950) ("[I]f the cause of action is predicated on the alleged breach, or even negligent breach, of a contract between the parties, an action in tort will not lie."); *Foxfire Village, Inc. v. Black & Veatch, Inc.,* 304 S.C. 366, 404 S.E.2d 912, 917 (Ct.App.1991) (same). If Wilson Group were allowed to bring its negligence action, the distinction between tort and contract would be totally eviscerated. "The integrity of contract must be maintained, or contract law will 'drown in a sea of tort.' The court must be vigilant in preventing the 'inevitable efforts of lawyers to turn every breach of contract into a tort.' " *Myrtle Beach Pipeline Corp. v. Emerson Electric Co.,* 843 F.Supp. 1027, 1043 (D.S.C.1993), *aff'd,* 46 F.3d 1125 (4th Cir.1995). Moreover, permitting Wilson Group to prosecute its negligence claim would undermine the reason and goal of entering into contracts—that the parties receive the benefit of their bargain. Therefore, the court denies Wilson Group's Motion to Amend Complaint because it would be futile.

## VI. CONCLUSION

For the forgoing reasons the court: (1) denies Quorum's Motion for Partial Sum-

mary Judgment as it relates to the statute of limitations (2) grants Quorum's Motion for Partial Summary Judgment as it relates to Wilson Group's release of all claims it may have had against Quorum arising out of the October 1, 1985 management agreement; (3) grants Quorum's Motion for Partial Summary Judgment as it relates to the UTPA; (4) denies HCA's Motion for Summary Judgment as it relates to the statute of limitations; (5) grants HCA's Motion for Summary Judgment as it relates to the UTPA; and (6) denies Wilson Group's Motion to Amend Complaint.

IT IS SO ORDERED.