# LIBERTY MUTUAL INSURANCE COMPANY, Plaintiff,

v.

# EMPLOYEE RESOURCE MANAGEMENT, INC.; William Attaway, Jr.; Robert Berman; William E. King, III; Robert T. Rand; and Kelli Yountz, Defendants.

### No. C/A NO. 2–98–2205–18.

United States District Court,
D. South Carolina,
Charleston Division.

March 29, 2001.

W. Howell Morrison, Charleston, SC, Lynn E. Szymoniah, Boca Raton, FL, for plaintiff.

Timothy Bouch, O. Grady Query, W. Jefferson Leath, Charleston, SC, for defendants.

### ORDER

NORTON, District Judge.

This matter is before the court on a veritable plethora of post-trial motions following a June 2000 jury trial in this matter.[1]

### I. Factual Background

Plaintiff commenced this action on July 28, 1998, asserting state law causes of action against Employee Resource Management, Inc. ("ERM") for breach of contract and violation of the South Carolina Unfair Trade Practices Act ("SCUTPA"). Plaintiff also asserted federal question causes of action against defendants Attaway, Berman, King, Rand, and Yountz ("Individual Defendants") for violation of 42 U.S.C. § 1962(a) and (c) of the Racketeering Influenced and Corrupt Organization Act ("RICO").

Pre-trial discovery in this case was extensive. The parties exchanged or reviewed an estimated thirty thousand (30,-000) documents and took depositions of no less than twenty-five (25) fact and expert witnesses. Similarly, the parties' case-dispositive motions proved to be voluminous and complex.

A jury trial was held on June 12–19 and June 26–28, 2000. On June 27, 2000, this court granted the individual defendants judgment as a matter of law on the RICO § 1962(c) cause of action, but submitted the breach of contract and SCUTPA causes of actions against ERM to the jury on June 28, 2000. Later that same day, the jury returned verdicts for plaintiff on both causes of action, including a finding that ERM willfully violated the SCUTPA. The jury awarded plaintiff actual damages in the amount of $956,953.08 on both counts.

The deputy clerk entered a judgment in the amount of $956,592.08 on June 29, 2000. On July 6, 2000, plaintiff filed a Notice of Election of Remedy and Request for Additional Relief. In this Notice, plaintiff requested that this court treble

---

1. ERM filed a Motion for Judgment as a Matter of Law, in the Alternative, for a new trial, and in the alternative, for a new trial *nisi remittitur*. Liberty Mutual filed motions to

recover attorney's fees, costs, and prejudgment interest from ERM. The Individual Defendants filed motions for attorney's fees and costs.

the actual damages award and enter judgment accordingly for plaintiff in the amount of Two Million Eight–Hundred Sixty–Nine Thousand Seven Hundred Seventy–Six and 24/100 ($2,869,776.24) Dollars. In response, ERM filed motions for judgment as a matter of law, or in the alternative for a new trial, and in the alternative for a new trial *nisi remittitur*.

## II. Defendant's Post–Trial Motions

### A. Employee Resource Management's Motion for Judgment as a Matter of Law, or in the alternative, For a New Trial, and in the alternative, For a New Trial *Nisi Remittitur*

ERM moves pursuant to Rules 50(b) and 59 for an Order granting judgment as a matter of law, or in the alternative, for a new trial and/or new trial *nisi remittitur*.

#### 1. ERM's Motion for Judgment as a Matter of Law Pursuant to Rule 50(b)

At the conclusion of plaintiff's case, defendants moved for Judgment as a Matter of Law pursuant to Rule 50(a) to dismiss Count II of plaintiff's Amended Complaint, which alleged violations of the South Carolina Unfair Trade Practices Act ("SCUTPA") against ERM. This court denied the motion. ERM now moves pursuant to Rule 50(b) for judgment as a matter of law on Count II of the Amended Complaint.

 Rule 50(b) provides that: "[i]f, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the

action to the jury subject to the court's later deciding the legal questions raised by the motion." A party is entitled to judgment as a matter of law "if the nonmoving party failed to make a showing on an essential element of his case with respect to which he had the burden of proof." *Price v. City of Charlotte*, 93 F.3d 1241, 1249 (4th Cir.1996) (quoting *Bryan v. James E. Holmes Regional Med. Ctr.*, 33 F.3d 1318, 1333 (11th Cir.1994)). If there is any evidence on which a reasonable jury could return a verdict in favor of the nonmoving party, judgment as a matter of law should not be granted. *See id.* However, judgment as a matter of law is appropriate when the evidence can support only one reasonable conclusion. *See Chaudhry v. Gallerizzo*, 174 F.3d 394, 405 (4th Cir. 1999), *cert. denied*, 528 U.S. 891, 120 S.Ct. 215, 145 L.Ed.2d 181 (1999); *Singer v. Dungan*, 45 F.3d 823, 827 (4th Cir.1995); *Persinger v. Norfolk & Western Ry. Co.*, 920 F.2d 1185, 1189 (4th Cir.1990) (holding that JNOV [now Judgment as a Matter of Law][2] "should not be granted unless the evidence is so clear that reasonable men could reach no other conclusion than the one suggested by the moving party.").

The court must review the evidence and all reasonable inferences in the light most favorable to the nonmoving party. *See Price*, 93 F.3d at 1249. In considering a motion for judgment as a matter of law, the court must not re-weigh the evidence, make credibility determinations, or substitute its own judgment for the jury's. *See id.; see also Anheuser–Busch, Inc. v. L & L Wings, Inc.*, 962 F.2d 316, 318 (4th Cir.1992), *cert. denied*, 506 U.S. 872, 113 S.Ct. 206, 121 L.Ed.2d 147 (1992). A party moving for judgment as a matter of law,

---

**2.** "Effective December 1, 1991, Rule 50 of the Federal Rules of Civil Procedure was amended. Under the amended Rule 50, the motion for directed verdict and the motion for Judgment Notwithstanding the Verdict (or motion for JNOV) are called motions for judgment as a matter of law." *Miller v. Rowan Companies, Inc.*, 55 F.Supp.2d 568, 572 (S.D.Miss. 1998).

bears a heavy burden to establish that the jury's verdict should be invalidated. *See Thompson v. Direct Impact, Co.,* 63 F.Supp.2d 721, 723 (E.D.Va.1998), *aff'd* 188 F.3d 503 (4th Cir.1999). In ruling on a renewed motion for judgment as a matter of law, a court may allow the jury's verdict to stand, order a new trial, or direct entry of judgment as a matter of law. *See* Fed. R.Civ.P. 50(b). In sum, "[a] renewed motion for judgment as a matter of law is not an occasion for the Court to usurp the jury's authority to weigh the evidence and gauge the credibility of witnesses." *See Thompson,* 63 F.Supp.2d at 723 (citing *Taylor v. Home Ins. Co.,* 777 F.2d 849, 854 (4th Cir.1985)). "The defendant bears a 'heavy burden' in establishing that the evidence is insufficient to uphold the jury's verdict." *Thompson,* 63 F.Supp.2d at 723 (citing *Price,* 93 F.3d at 1249).

### 2. ERM's Argument that the SCUTPA Only Applies to Consumer Protection or Antitrust Activity

■ In its Rule 50(b) motion, ERM reasserts an argument it made in its Rule 50(a) motion. It argues that the SCUTPA is limited solely to instances of consumer protection or antitrust activity, because the FTC Act [15 U.S.C. § 45(1)(n) ] is so limited. ERM premises this argument on § 39–5–20(b) of the SCUTPA, which provides:

> [I]t is the intent of the Legislature that in construing paragraph (a) of this section [declaring unlawful unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce] the courts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to § 5(a)(1) of the Fed-

eral Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended.

Contrary to ERM's argument, § 39–5–20(b) merely provides that the courts shall be guided by the FTC and federal court interpretation.[3] The language of the SCUTPA itself declares unlawful "unfair methods of competition and unfair or deceptive acts or practices within the conduct of any trade or commerce." S.C.Code Ann. § 39–5–209(a). The South Carolina Supreme Court recently held that "the provisions of any services constitutes commerce within the meaning of the UTPA." *Taylor v. Medenica,* 324 S.C. 200, 479 S.E.2d 35, 44 (1996). In at least two cases, the South Carolina Supreme Court affirmed the applicability of the SCUTPA in contexts that fall outside of the "usual" consumer protection and antitrust actions. *See, e.g., Taylor v. Medenica,* 479 S.E.2d at 44 (holding that both physician and laboratory medical services fell within the expansive commerce definition of the SCUTPA); *Prestwick Golf Club, Inc. v. Prestwick, Ltd. Partnership,* 331 S.C. 385, 503 S.E.2d 184, 187 (1998) (holding that abrogation of tee time schedule by defendant could give rise to a SCUTPA cause of action). Moreover, a federal district court in South Carolina has specifically held that the SCUTPA is not constrained solely to consumer protection:

> [t]he UTPA does not expressly apply only to consumer transactions. Judicial interpretation of the UTPA, by requiring that a transaction must affect the public interest to be cognizable, may have given a de facto consumer orientation to it. But the South Carolina UTPA also includes transactions between businesses or commercial entities such as the parties to these actions. That this interpretation of South Carolina's UTPA is correct is necessarily

---

**3.** The FTC does not provide a private cause of action, while the SCUTPA does. *See generally, Plowman v. Bagnal,* 316 S.C. 283, 450 S.E.2d 36 (1994).

implied by South Carolina decisions involving only non-consumer parties such as *Noack Enterprises, Inc. v. Country Corner Interiors,* 290 S.C. 475, 351 S.E.2d 347 (1986) and *Key Co., Inc. v. Fameco Distributors,* 292 S.C. 524, 357 S.E.2d 476 (1987). If a dispute between non-competing businesses or commercial entities were not within the UTPA's scope, the court would never have reached the issue of required involvement of the public interest in *Noack* or the issue of the insufficiency of a mere breach of contract in *Fameco.* Consequently, the fact the parties' transaction is not a consumer transaction does not prevent it from giving rise to a UTPA claim.

*McTeer v. Provident Life & Accident Ins.,* 712 F.Supp. 512, 515 (D.S.C.1989). Based on the foregoing discussion, this court rejects ERM's argument that the SCUTPA is limited solely to instances of consumer protection or antitrust activity because the FTC Act [15 U.S.C. § 45(1)(n) ] is so limited.

### a. Liberty Mutual Proved that the Unfair/Deceptive Act Had An Impact Upon the Public Interest

■ In order for an unfair or deceptive act or practice to be covered under the SCUTPA, the unfair or deceptive act or practice must impact the public interest. *See York v. Conway Ford, Inc.,* 325 S.C. 170, 480 S.E.2d 726, 728 (1997); *Global Protection Corp. v. Halbersberg,* 332 S.C. 149, 503 S.E.2d 483, 487 (1998). ERM argues in its Memorandum in Support of its Motion for Judgment as a Matter of Law that Liberty Mutual failed to establish the effect on the "public interest."

ERM's unfair acts or practices satisfy the public interest requirement of the SCUTPA. The holding in *Burbach v. Investors Management Corp. Int'l,* 326 S.C. 492, 484 S.E.2d 119, 120 (1997), can be read for the proposition that where the government regulates an economic relationship, the fact that the parties' relationship is also governed by a contract will not preclude a finding of "public interest" under the SCUTPA if the government regulation imposes on the parties a framework of duty without regard to their contractual arrangements. Following *Burbach,* the framework of statutory duties and obligations existing between an employer and a workers' compensation insurance carrier, especially the duties established under the Assigned Risk Plan and the South Carolina Staff Leasing Services Act (S.C.Code Ann. § 40–68–10, *et seq.*), place the relationship of the parties in this case clearly within the public domain.

■ The SCUTPA's "public interest" requirement may be satisfied in South Carolina if the alleged unfair or deceptive acts or practices have the potential for repetition. *See York v. Conway Ford, Inc.,* 325 S.C. 170, 480 S.E.2d 726, 728 (1997); *Global Protection Corp. v. Halbersberg,* 332 S.C. 149, 503 S.E.2d 483, 487 (1998). Potential for repetition may be shown in two ways: "(1) by showing the same kind of actions occurred in the past, thus making it likely they will continue to occur absent deterrence; or (2) by showing the company's procedures create a potential for repetition of the unfair and deceptive acts." *Daisy Outdoor Advertising Co., Inc. v. Abbott,* 322 S.C. 489, 473 S.E.2d 47, 49–50 (1996). Further, the plaintiff in a SCUTPA action is required only to allege and prove those facts sufficient to demonstrate potential for repetition; at that point, plaintiff has proven an adverse effect on the public interest sufficient to recover under the SCUTPA. *See Crary v. Djebelli,* 329 S.C. 385, 496 S.E.2d 21, 23 (1998). Liberty Mutual presented evidence at trial of ERM's conduct in violation of the "public interest" requirement of the SCUTPA, as evidenced by the jury's specific finding of a willful violation of the SCUTPA. Bearing in mind the axiom that

the whole is often greater than the sum of its parts, this court cannot overstate the importance of the legal weight of the specific jury finding. The following evidence from the trial record supports the jury's verdict.

### b. ERM'S Failure to Pay What It Owed Under the Assigned Risk Plan Adversely Affected Other Insurers, Companies, and Their Insureds by Way of Increased Premium Rates

In its Memorandum in Support of its Motion for Judgment as a Matter of Law, ERM references the testimony of Liberty Mutual witness Dean Kruger to support its argument that its actions did not satisfy the public interest requirement of the SCUTPA. Reference to the record of Mr. Kruger's testimony is given below. If the jury believed any of Mr. Kruger's testimony in this regard, even if they believed nothing else regarding impact on the "public interest," this testimony alone would be sufficient to sustain the verdict of willful violation of the SCUTPA.[4]

| Witness | Vol. | Page/Line | Testimony/Exhibit |
|---------|------|-----------|-------------------|
| Dean Kruger | II | p. 313, l. 15–18; p. 316, l. 1–17 | Cost of insurance fraud borne by all employers in South Carolina |
| Dean Kruger | II | p. 331, l. 10–18 | Premium losses are charged back to South Carolina employers |
| Dean Kruger | II | p. 331, l. 7–25; p. 332, l. 1–2 | The harm to Liberty Mutual is loss of premium due |

### c. ERM's Actions Enabled It to Compete Within the Employee Leasing Industry With the Unfair Advantage of Having Low Workers' Compensation Premiums

Liberty Mutual's continuing theme throughout the trial of this case was the accelerated growth of ERM towards its ultimate sale to SES. As an employee leasing company, one of the largest cash outlays or overhead expenditures for ERM was workers' compensation insurance. Liberty Mutual argued and proved that ERM engaged in a continuing pattern of activity designed to withhold premiums due to Liberty Mutual and that these activities lowered ERM's overhead/liabilities and made it appear more profitable, and therefore, more valuable to SES. Using this scheme, ERM was able to compete unfairly with other employee leasing companies. It is this conduct which establishes both an adverse impact on the "public interest," as well as the potential for repetition required by *Daisy Outdoor*. The following excerpts of trial testimony support this finding:

---

**4.** This court has carefully reviewed the trial excerpts submitted by Liberty Mutual and has not merely rubber-stamped the excerpts submitted by plaintiff in support of its arguments. This court omitted those excerpts that are not applicable to the public interest analysis and also those that were superfluous. These excerpts clearly bolster the jury's determination that ERM willfully violated the SCUTPA.

| Witness | Vol. | Page/Line | Testimony/Exhibit |
|---|---|---|---|
| Dennis Kokulak | III | p. 551, l. 6–17 | Final premiums for workers' comp. are tallied at year-end, but should indicate "significant changes" affecting premium within the year. |
| Jeff Tipton | III | p. 558, l. 19—<br>p. 559, l. 13 | How workers' compensation premiums are calculated |
| Jeff Tipton | III | p. 562, l. 21—<br>p. 563, l. 18 | Non-disclosure of payroll by ERM |
| Jeff Tipton | III | p. 680, l. 18—<br>p. 681, l. 5 | Deceit in application for workers' comp. insurance by ERM<br><br>Ex. 173 (ERM application for W.C. insurance dated 12/26/90) |
| Robert Rand | VI | p. 1028, l. 4–17 | Discussion of ERM's practice of paying "band-aid" claims out-of-pocket to control workers' compensation costs |
| Robert Rand | VI | p. 1097, l. 3–17 | ERM client Fisk Farms billed for workers' comp. when Fisk Farms had no coverage |
| Robert Barrow | VI | p. 1153, l. 22—<br>p. 1159, l. 11 | Adding ERM Charleston location to Cincinnati Insurance policy resulted in non-disclosure of payroll/premium increases |
| Billie Attaway | V | p. 898, l. 13—<br>p. 900, l. 7 | ERM sought to lower its workers' comp. premiums by decreasing the claims it filed by handling "band-aid" claims in-house through Kelly Yountz, per B. Attaway's direction |

### (1). ERM Misled Some Clients As To Whether They Had Workers' Compensation Insurance Coverage Placing Liberty Mutual and the Uninsured Clients At Risk

Another focus of Liberty Mutual at the time of trial was ERM's deception of some clients as to whether they had workers' compensation insurance, thereby placing Liberty Mutual and the uninsured clients at risk for uncovered claims. Liberty Mutual submitted credible evidence that a subsidiary of ERM, At Once Temporary Services, ("AOTS") was concealed from Liberty Mutual from its inception through the 1994 audit; was initially not charged workers' compensation premiums by ERM; and then later was overcharged workers' compensation premiums for coverage it did not in fact have.

Additionally, clients such as St. Louis Beer Sales ("SLBS"), Bullet Deliveries, and Fisk Farms, had their accounts charged by ERM for workers' compensation premiums which ERM did not pay to Liberty Mutual, nor was there coverage in place from Liberty Mutual for these client companies. This pattern of conduct also satisfies the public interest component of the SCUTPA because these practices of ERM were in fact repeated, and thus capable of repetition. Moreover, in addition

to Liberty Mutual, innocent third party clients and their employees were placed at significant risk of non-coverage by the deceptive conduct of ERM. The testimony supporting this finding will be subdivided into two smaller categories, as follows:

### (a). ERM Misled Some Clients as to Whether They Had Workers' Compensation Insurance

| Witness | Vol. | Page/Line | Testimony/Exhibit |
|---|---|---|---|
| Jim Lyles | I | p. 260, l.17— p. 262, l. 12–13 | Fisk Farms investigation/invoices for workers' comp., showing premiums paid for each employee |
| Terri Whitman | II | p. 370, l. 16–19 | ERM provided leased workers' comp. coverage to Fisk Farms |
| Terri Whitman | II | p. 371, l. 8— p. 372, l. 12 | ERM invoiced Fisk Farms expenses for workers' compensation coverage |
| Terri Whitman | II | p. 372, l. 13— p. 373, l. 14 | Fisk Farms wanted all their employees to be covered with workers' comp. insurance |
| | | | **Ex. 233 (ERM invoices to Fisk Farms)** |
| Terri Whitman | II | p. 378, l. 4— p. 379, l. 2 | Fisk Farms wanted insurance for all of its subcontractors |
| | | | **Ex. 239 (B. Attaway letter to Fisk Farms regarding certificates of insurance dated 5/3/94)** |
| Terri Whitman | II | p. 380, l. 6–13 | Whitman believed all Fisk Farms employees and sub-contractors had workers' compensation coverage |
| Terri Whitman | II | p. 388, l. 17–24 | Whitman believed no special workers' compensation coverage for agricultural workers |
| Harry Davis | IV | p. 754, l. 1–25 p. 755, l. 8 p. 756, l. 8–25 p. 758, l. 8–21 | ERM "covered" AOTS' workers' comp. until spring of 1994. Billed for the first time between $11,000 & $12,000 for worker's compensation, then billed $70,000 for workers' compensation |
| Harry Davis | IV | p. 758, l. 8–21 | Discussion of $70,000 bill to AOTS for workers' compensation |
| Billie Attaway | V | p. 967, l. 24–25— p. 968, l. 1–2 | Increase in Bullet Deliveries workers' compensation premium |

Ex. 28 (Attaway letter to Joe Keesling dated 8/9/94)

| Kelly Yountz | VII | p. 1394, l. 16–25, p. 1395, l. 1–5 p. 1400, l. 2–6 | Deductible charged by ERM to some clients then some paid out of pocket for small claims |
|---|---|---|---|
| Kelly Yountz | VII | p. 1401, l. 9 | ERM/Yountz letter to Fisk Farms to report all accidents |

Ex. 244 (Yountz letter To Fisk Farms dated 1/29/92)

| Steve Balk | Depo. | p. 43, l. 1–13 | Workers' compensation information ERM obtained from SLBS |
|---|---|---|---|
| Steve Balk | Depo. | p. 44, l. 14— p. 45, l. 12 | W–C Classification Codes for SLBS employees |
| Joe Keesling | Depo. | p. 19, l. 24— p. 20, l. 11 | Bullet Deliveries believed they had workers' compensation insurance through ERM |
| Joe Keesling | Depo. | p. 24, l. 23— p. 25, l. 5 | Keesling believed ERM provided Bullet with workers' compensation coverage |
| Joe Keesling | Depo. | p. 26, l. 25— p. 27, l. 15 | ERM "handled" Bullet's workers' compensation claims |

The foregoing provides ample evidence that ERM engaged for an extended period of time in a practice of representing to their client companies that workers' compensation insurance coverage was provided in their employee leasing contracts, and those client companies were billed for this coverage when none was in fact provided. This pattern of deceptive behavior possessed not only the potential for repetition, but was in fact repeated with the three clients listed above, thus satisfying the public interest requirement of the SCUTPA.

**(b). ERM Placed Liberty Mutual & the Other Insured Clients (Bullet Deliveries, Fisk Farms, & AOTS) At Risk Due to Its Conduct**

Liberty Mutual submitted evidence that ERM used the following procedures to place its uninsured clients, Bullet Deliveries, Fisk Farms and AOTS, at risk. This was accomplished by handling "band-aid" claims in-house and not reporting all of those claims or the existence of certain client companies to Liberty Mutual during the 1994 audit process. Liberty Mutual paid considerable attention to AOTS, as a subsidiary of ERM, which was not charged for worker's compensation for several years, then overcharged for workers' compensation in 1994 and 1995. Liberty Mutual also proved that ERM failed to disclose AOTS to in the years preceding and during the 1994 audit procedure. The jury was presented with the following evidence supporting Liberty Mutual's contention:

| Witness | Vol. | Page/Line | Testimony/Exhibit |
|---|---|---|---|
| Angie Owen | I | p. 68, l. 5–20—<br>p. 72, l. 3–16 | Attaway requests to add additional states to cover St. Louis Beer Sales, who had never been added or charged by ERM until 1994 |
| | | | **Ex. 75 (Attaway fax to Liberty Mutual requesting additional states be added to policy dated 5/26/94)** |
| Randy Smith | I | p. 154, l. 1–14 | Smith (Liberty Mutual auditor) asks for all client subsidiary records for 1994 audit |
| Randy Smith | I | p. 176, l. 16–19 | Robert Rand did not talk about AOTS with Smith |
| Randy Smith | I | p. 176, l. 24—<br>p. 177, l. 1–5 | Smith again asks for all client subsidiary records for 1994 audit |
| Randy Smith | I | p. 209, l. 20 | Robert Rand never told Smith that AOTS records were at another location |
| Randy Smith | I | p. 202, l. 6–8 | Smith wanted payroll for all employees of policy holder; Robert Rand did not provide payroll for employees of AOTS |
| Randy Smith | I | p. 208, l. 10–17;<br>p. 209, l. 14 | Smith asked for AOTS records; were never produced to him |
| Randy Smith | I | p. 211, l. 11–19 | Smith told by ERM representatives that he had all client subsidiary records; did not have AOTS records at that time. |
| Jim Lyles | I | p. 255, l. 12–24 | During his investigation, Lyles discovered numerous ERM/AOTS injuries treated at Baker Hospital; many had not been reported to the workers' comp. commission |
| Neil Johnson | II | p. 403, l. 21—<br>p. 404, l. 7–14 | Investigation of Baker Hospital claims & AOTS |
| | | | **Ex. 15 (1992 audit) (compare with Jim Lyles' testimony above)** |
| Neil Johnson | II | p. 405, l. 11—<br>p. 406, l. 4 | 1992 audit worksheet showed one AOTS code |
| Neil Johnson | II | p. 490, l. 22—<br>p. 491, l. 7 | Only code listed for AOTS was "clerical;" other types of workers not disclosed |
| Harry Davis | IV | p. 749, l. 10–15<br>p. 750, l. 6 | ERM paid "band-aid" claims and billed back to clients; no insurance coverage existed, no reporting to Liberty Mutual of these claims |
| Harry Davis | IV | p. 762, l. 6–20 | Davis told by Robert Rand all files/documents necessary for '94 audit were in the room provided to Liberty Mutual |

| | | | |
|---|---|---|---|
| Harry Davis | IV | p. 766, l. 3—<br>p. 768, l. 1–23 | 1994 audit scope problems; R. Berman and R. Rand postpone audit until B. Attaway returned; Davis testifies no problem with scope of Liberty Mutual audit, within generally accepted accounting principles (GAAP) |
| Harry Davis | IV | p. 768, l. 14–23 | Regarding AOTS, Davis told and believed all necessary documents were in audit room |
| Harry Davis | IV | p. 786, l. 8–22 | Regarding AOTS, Davis again believed all records pertinent to audit were in room provided to Liberty Mutual |
| Robert Rand | VI | p. 1022, l. 1–19 | AOTS payroll records were maintained off-site of audit premises (Wappoo Center) |
| Robert Rand | VI | p. 1025, l. 2—<br>p. 1026, l. 24 | Bullet Deliveries was classified as "administrative services only" with a different Federal I.D. number |
| Robert Rand | VI | p. 1027, l. 8–23 | ERM set up two companies for Fisk Farms and split administrative workers from agricultural |
| Robert Rand | VI | p. 1027, l. 20—<br>p. 1028, l. 17 | Rand admits "band-aid" claims were paid |
| Robert Rand | VI | p. 1058, l. 16—<br>p. 1059, l. 5 | Rand admits "band-aid" claims were not reported to Liberty Mutual |
| Robert Rand | VI | p. 1074, l. 4—<br>p. 1075, l. 4 | Rand discusses records needed for audit; AOTS employees should have been covered in audit |
| Robert Rand | VI | p. 1088, l. 19—<br>p. 1089, l. 4 | Bullet Deliveries records for the 1994 audit |
| Robert Rand | VI | p. 1090, l. 8–18 | Bullet Deliveries was never reported to Liberty Mutual in 1994 |
| Robert Rand | VI | p. 1092, l. 8–11 | AOTS had workers' compensation through ERM |
| Robert Rand | VI | p. 1093, l. 19—<br>p. 1096. l. 16 | Location of audit records administered accounts; not provided at audit, but R. Smith's fault for not asking where they were |
| Robert Rand | VI | p. 1109, l. 22—<br>p. 1111 l. 14 | Workers' compensation premiums for SLBS collected by ERM |
| Robert Rand | VI | p. 1114, l. 3–25 | SLBS payroll information |
| Robert Rand | VI | p. 1122, l. 3–19 | "Mistake" that Bullet Deliveries' records were not at 1994 audit |

| | | | |
|---|---|---|---|
| Robert Rand | VI | p. 1117, l. 7–19 | Fisk Farms on Certificate of Insurance, no distinction noted between administrative or agricultural workers |
| Robert Berman | VII | p. 1279, l. 13–25—<br>p. 1280, l. 13 | Fisk Farms agricultural workers |
| Robert Berman | VII | p. 1296, l. 21–22 | Admits "band-aid" claims paid by ERM |
| Robert Berman | VII | p. 1307, l. 2–17<br>p. 1310, l. 10 | Invoices to Fisk Farm gave appearance that they had worker's comp. when they were in fact not insured for worker's compensation |
| | | | **Ex. 243 (contract b/t ERM and Fisk Farms)** |
| Robert Berman | VII | p. 1311, l. 3–8—<br>p. 1312, l. 6 | ERM submitted claims for Fisk Farms agricultural workers to to Liberty Mutual |
| | | | **Ex. 74 (Callahan claim form * First Report of Injury)** |
| Kellie Yountz | VII | p. 1390, l. 15–25;<br>p. 1391, l. 17–25 | Discussion of ERM's "band-aid" claim policy; discretion regarding whether claim paid in-house or reported by B. Attaway or R. Berman |
| Kellie Yountz | VII | p. 1403, l. 7–11—<br>p. 1404, l. 5–19 | AOTS first report of injury forms |
| Steve Balk | Depo. | p. 88, l. 8—<br>p. 89, l. 1 | St. Louis Beer Sales had deductible with ERM |
| | | | **Ex. 75 (5–26–94 letter from B. Attaway to Liberty Mutual adding St. Louis Beer Sales to policy; never disclosed previously until claim occurred)** |
| | | | **Ex. 78 (contract b/t ERM and SLBS dated 1/18/94)** |
| Steve Balk | Depo. | p. 96, l. 19—<br>p. 97, l. 17 | Workers' compensation report ERM invoices & payroll to SLBS prior to 1994 |
| | | | **Ex. 79 (SLBS Report) Ex. 271 (R. Rand letter to Balk regarding weekly payroll dated 1/12/94)** |
| Howard Chapman | Depo. | p. 24, l. 16—<br>p. 26, l. 4 | Believed AOTS always had workers' compensation coverage through ERM |
| Howard Chapman | Depo. | p. 26, l. 15—<br>p. 28, l. 25 | Filling out first reports of injury |
| Howard Chapman | Depo. | p. 29, l. 10—<br>p. 30, l. 6 | Filling out first reports of injury |

| | | | |
|---|---|---|---|
| Howard Chapman | Depo. | p. 33, l. 11—<br>p. 34, l. 14 | ERM handled AOTS's injury claims |
| Howard Chapman | Depo. | p. 34, l. 22—<br>p. 35, l. 22 | Chapman called ERM when a client asked about workers' compensation coverage |
| Howard Chapman | Depo. | p. 45, l. 1—<br>p. 46, l. 19 | ERM letter of 10/5/94 regarding $70,000 workers' compensation bill to AOTS |
| | | | **Ex. 230 (ERM letter to Chapman dated 10/5/94)** |

\* The jury answered the question with a damages award in the amount of $956,592.08.

### d. ERM Deceived the Cincinnati Insurance Co., Fireman's Fund & the Georgia Assigned Risk Plan When it Tried to Obtain New Coverage in Georgia

Liberty Mutual showed that after its relationship with ERM soured in the wake of the 1994 audit, ERM began to search for alternative means to satisfy its workers' compensation insurance requirements, including the retainer of an insurance agent in Georgia. This agent, Robert Barrow, recommended that ERM form a Georgia corporation. The purpose of forming this corporation, as explained by Liberty Mutual witness Dean Kruger, was to "back-door" the substantial payroll reporting requirements of ERM's Charleston operation and clients in other states into Georgia by setting up a shell corporation in Georgia initially, and then moving additional payroll/clients on the Georgia policy at a later date. According to Liberty Mutual, the net result of the scheme was that ERM, through ERM of Georgia, deceived the Cincinnati Insurance Company, Fireman's Fund Insurance Company, and the Georgia Assigned Risk Plan by establishing the shell corporation and misrepresenting over $20,000,000 of payroll liability from ERM's South Carolina operation, in addition to its clients in other states. Citations to the record supporting the foregoing are given below.

| Witness | Vol. | Page/Line | Testimony/Exhibit |
|---|---|---|---|
| Dean Kruger | II | p. 312, l. 23—<br>p. 312, l. 8 | Discussion of using the Georgia corporation to "back-door" coverage of ERM's South Carolina operations |
| Jeff Tipton | III | p. 696, l. 9—<br>p. 697, l. 11 | Discussion of Cincinnati Insurance |
| | | | (Ex. 289) |
| Tom Corcoran | IV | p. 793, l. 6—<br>p. 794, l. 19 | AOTS not disclosed t o Fireman's Fund |

| | | | |
|---|---|---|---|
| Tom Corcoran | IV | p. 796, l. 5— p. 797, l. 7 | AOTS not disclosed to Fireman's Fund, but certificate of insurance issued by R. Barrow in Georgia |
| Tom Corcoran | IV | p. 809, l. 6–11 | AOTS not disclosed in 1994 or 1995 to Fireman's Fund |
| Billie Attaway | V | p. 927, l. 23 | Plan to set up Georgia "shell corporation" |

**Ex. 35 (4/4/94 ERM Board Minutes)**

| | | | |
|---|---|---|---|
| Billie Attaway | V | p. 939, l. 19–23; p. 940, l. 12–14 | ERM to set up shell Georgia corporation |
| Billie Attaway | V | p. 949, l. 15 | Further discussions on ERM setting up shell Ga. corporation through Robert Barrow; voted on by all principals of ERM |
| Robert Rand | VI | p. 1029, l. 20— p. 1031, l. 21 | Telephone call to R. Barrow regarding ERM's workers' compensation options |
| Robert Rand | VI | p. 1102, l. 7— p. 1105, l. 13 | ERM of Georgia to be "a shell of a corporation" |
| Robert Barrow | VI | p. 1148, l. 20— p. 1153, l. 18 | ERM's options discussed at 4–4–94 Board Meeting; "short term" solution of Cincinnati or Fireman's Fund coverage (payroll could be hidden until audit) |
| Robert Barrow | VI | p. 1157, l. 21— p. 1159, l. 6 | Georgia application omitted $20,000,000 of ERM's payroll |
| Robert Barrow | VI | p. 1159, l. 12— p. 1160, l. 9 | Barrow/ERM omitted AOTS from Fireman's Fund application |
| Robert Berman | VII | p. 1270, l. 1–5 | Berman testified reason ERM move to Georgia not completed was because some of officers did not want to move from Charleston, South Carolina |
| Robert Barrow | Depo. | p. 21, l. 21— p. 22, l. 14 | ERM opening office in Georgia |
| Robert Barrow | Depo. | p. 25, l. 5— p. 26, l. 23 | Formation of ERM of Georgia Corporation |
| Robert Barrow | Depo. | p. 29, l. 14— p. 31, l. 25 | Insurance coverage for ERM of Georgia |

**Ex. 284 (Georgia application for workers' compensation)**

| | | | |
|---|---|---|---|
| Robert Barrow | Depo. | p. 23, l. 11— p. 35, l. 24 | Discussion regarding ERM of Georgia application for workers' compensation |
| Robert Barrow | Depo. | p. 42, l. 2— p. 43, l. 11 | Barrow letter to ERM advising that states can be added to Cincinnati policy |

**Ex. 287 (see above)**

| Robert Barrow | Depo. | p. 44, l. 721— p. 45, l. 23 | Discussion of Barrow letter to Cincinnati Ins. |
|---|---|---|---|
| Robert Barrow | Depo. | p. 46, l. 12–19 | Barrow identifies fax to Jim Lyles |

**Ex. 288 (see above)**

| Robert Barrow | Depo. | p. 47, l. 23— p. 49, l. 10 | Barrow letter to Cincinnati Ins. canceling coverage |

**Ex. 289 (see above)**

| Robert Barrow | Depo. | p. 53, l. 23— p. 55, l. 11 | R. Berman letter to Barrow re: having Fireman's Fund Program by Sept. 1994 |

**Ex. 291 (ERM letter to Barrow dated 8/24/94)**

| Robert Barrow | Depo. | p. 82, l. 22— p. 86, l. 3 | AOTS not revealed to Fireman's Fund |

**Ex. 299 (Barrow letter to Gene King re: need list of clients dated 6/7/94)**

| Robert Barrow | Depo. | p. 86, l. 7–20 | R. Berman letter to Barrow re: information on AOTS |
| Robert Barrow | Depo. | p. 104, l. 10–23 | Cincinnati Insurance Company Binder |

**Ex. 304 (Workers' Compensation & Employer liability policy dated July 1994)**

### e. ERM'S Offer of the Sale of Its Stock to SES Was Predicated Upon a Grossly Underestimated Liability to Liberty Mutual for Workers' Compensation Premiums

As noted above, it was Liberty Mutual's theory that ERM's principals planned to build the business quickly in the ultimate hopes of selling it off at a large profit. This motive, in and of itself, is certainly neither actionable nor objectionable. However, in order to inflate its value and entice buyers, there was ample evidence that ERM deliberately underestimated its liability to Liberty Mutual for workers' compensation premiums in order to show maximum profits from its operations. Again, ERM repeated this practice in a pattern or course of conduct through its accounting principles and procedures which only ceased upon the sale of ERM to SES. As such, the past repetition of this conduct is sufficient to justify the "potential for repetition" prong of *Daisy Outdoor*, and serves as additional support for the jury verdict in this case. *See generally*, 322 S.C. 489, 473 S.E.2d at 49–50. The testimony supporting this proposition is outlined below:

| Witness | Vol. | Page/Line | Testimony/Exhibit |
|---------|------|-----------|-------------------|
| Harry Davis | IV | p. 778, l. 4— p. 779, l. 17 | ERM's accounting practice was to roll over leftover workers' compensation accruals into profits in 1992 and 1993; 1994 financial numbers did not reflect the true amount of ERM's liability to Liberty Mutual |
| Robert Berman | VII | p. 1264, l. 11–17 | Berman testifies ERM disclosed Liberty Mutual debt to SES |
| Robert Berman | VII | p. 1283, l. 23–24 p. 1284, l. 1–18 | Further discussion of disclosure of Liberty Mutual debt to SES; Berman testifies told SES owed $156,000 when liability was assessed at $1.2 million |
| Robert Rand | VI | p. 1038, l. 25— p. 1039, l. 5 | Rand admits owed Liberty Mutual some premiums, but not $1.2 million |

There can be little doubt that ERM's continuing pattern of deception regarding its workers' compensation coverage in this instance impacts the public interest. ERM not only withheld information from the workers' compensation plan of another state and two additional insurance companies, but also exposed its own payroll and client companies' employees to the risk of non-coverage by its actions. The preceding citations to the trial record and the evidence adduced in this case clearly support the jury determination that ERM willfully violated the SCUTPA.

## B. ERM's Motion For a New Trial

██ ERM alternatively has moved for an order granting a new trial pursuant to Rule 59(a). Federal Rule of Civil Proce-

dure 59(a) allows for a new trial "[i]n an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." (West 2000). Generally, on a motion for a new trial, "[i]t is the duty of the judge to set aside the verdict and grant a new trial, if he is of the opinion that the verdict is against the clear weight of the evidence, or is based upon evidence which is false, or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Gill v. Rollins Protective Services Co.*, 836 F.2d 194, 196 (4th Cir.1987) (quoting *Aetna Cas. & Sur. Co. v. Yeatts*, 122 F.2d 350, 352–53 (4th Cir.1941)).

ERM contends that the court incorrectly charged the jury [5] and used an improper verdict form [6] with respect to proximate

---

**5.** ERM argues that the court incorrectly charged the jury when it included the following instruction:

If you find that plaintiff has suffered damages as a proximate cause of defendant Employee Resource Management's breach of contract or a violation of the unfair trade practices act, you must award plaintiff the actual damages it suffered as a result of Employee Resource Management's action.

**6.** The damages verdict form read:

If you answered no to question 1 on the breach of contract verdict form or you answered yes to question 2 on the South Carolina Unfair Trade Practices Act Verdict Form, then please answer the following question:

What is the total amount of actual damages to which Plaintiff is entitled as a result of its claims against Defendant?

* The jury answered the question with a damages award in the amount of $956,592.08.

cause and calculation of damages. ERM argues that it is impossible to determine, which, if any, damages should be trebled under the SCUTPA. The premise of ERM's argument is that a SCUTPA plaintiff must quantify and prove damages that are specifically and solely attributable to the alleged unfair trade practice.

■ This court denies ERM's motion for a new trial. The evidence at trial revealed that Liberty Mutual's damages under its breach of contract and SCUTPA claims were identical. Accordingly, this court finds that the damages should not have been separated on the verdict form and the jury instructions properly reflected this premise.

### C. ERM's Argument for Judgment of Law on the Breach of Contract Claim

ERM argues that it is entitled to judgment as a matter of law on plaintiff's contract claim as this claim is barred by the applicable statute of limitations. This court carefully analyzed the statute of limitations issue at summary judgment and once again at trial. After reviewing defendant's arguments once again on this issue, this court concludes that the statute of limitations issue was one properly submitted to the jury.

The 1994 insurance policy at issue provided *inter alia* that:

> The final premium will be determined after this policy ends by using the actual, not estimated, premium basis and the proper classifications and rates that lawfully apply to the business and work covered by this policy. If the final premium is more than the premium you paid to us, you must pay the balance ... You will let us examine and audit all your records that relate to this policy

... We may conduct the audit during regular business hours during the policy period and within three years after the policy period ends. Information developed by the audit will be used to determine final premium.

■ The discovery rule governed the statute of limitations issue in this case. The discovery rule provides that the statute of limitations for a breach of contract action accrues at the time the non-breaching party knew or by exercise of reasonable diligence should have known of the breach. *See The Wilson Group, Inc. v. Quorum Health Resources*, 880 F.Supp. 416, 424 (D.S.C.1995). ERM argued prior to trial that Liberty Mutual knew or should have known of ERM's breaches in 1994, thus, their claim for breach of contract, which was not brought until 1998, was barred by the three year statute of limitations period.

The evidence did not reveal that plaintiff knew of ERM's breaches in 1994. Plaintiff presented evidence that it was not aware of ERM's breach until September 1995, at which time a final audit revealed that ERM owed $1,377,943 to plaintiff for the 1994 premium. Moreover, there was no question that ERM seriously frustrated plaintiff's efforts to perform the audit pursuant to the contractual terms. As stated by Judge Currie in *The Wilson Group*, "this case present[ed] the typical situation where determining whether the discovery rule will relieve plaintiff from the operation of the statute of limitations [was] a question for the jury." *Id.* Accordingly, the first question posed to the jury by this court on the verdict form was: "Is the breach of contract claim barred by the statute of limitations?"

Both parties presented evidence on the statute of limitations issue to the jury. It was the jury's duty to decide if plaintiff's contract cause of action was barred by the three of year statute of limitations. The jury found answered in the negative. Thus, this court denies defendant's motion with regard to the statute of limitations issue.

### D. ERM's Motion for a New Trial *Nisi Remittur*

ERM argues that it is entitled to a new trial *nisi remittur* because the jury's verdict is the exact amount of plaintiff's expert, Mr. Tipton's, calculations. In essence, ERM argues that it was error for the jury to accept the Tipton Report *in toto*. ERM contends that the Tipton Report was incorrect and overstated the amount of premium due.

It was the jury's duty to determine the credibility of witnesses and to weigh the evidence. Obviously, the jury fully accepted Mr. Tipton's testimony and calculations. The jury was in a position to weigh the evidence and chose to accept plaintiff's witness's assessment of damages, therefore defendant's motion for a new trial *nisi remittur* is denied.

### III. Plaintiff's Post–Trial Motions

Plaintiff Liberty Mutual Insurance Company filed a Notice of Election of Remedy and Request for Additional Relief on July 6, 2000. Plaintiff requests that the court treble the actual damages award and enter judgment accordingly for plaintiff in the amount of Two Million Eight Hundred Sixty–Nine Thousand Seven Hundred Seventy–Six and <sup>24</sup>⁄₁₀₀ ($2,869,776.24) Dollars in accordance with the jury's finding of a willful or knowing violation of the South Carolina Unfair Trade Practices Act, under § 39–5–140(a). Plaintiff also requests an award of reasonable attorney's fees and costs in favor of plaintiff as provided in S.C.Code Ann. § 39–5–140(a). Additionally, plaintiff filed a motion for prejudgment interest on the actual damages in the amount of Three Hundred Eighty–Five Thousand One Hundred Forty–Five and <sup>00</sup>⁄₁₀₀ ($385,145.00) Dollars. The pre–judgment interest requested reflects the actual damage award from October 22, 1995 to June 28, 2000 at the rate of 8.75% annum.

ERM opposes plaintiff's Election on grounds that it has the "procedural affect" of amending the court's judgment without authority to do so. In response, plaintiff filed a Motion for Relief From Judgment Entered June 29, 2000.

### A. Election of Remedies

The doctrine of election of remedies "[f]orbids that one shall be twice vexed for one and the same cause." *United States v. Oregon Lumber Co.*, 260 U.S. 290, 301, 43 S.Ct. 100, 67 L.Ed. 261 (1922). Federal case law in this area is sparse. There is no provision in the federal rules allowing for an election of remedies, therefore the "[m]otion to elect is inappropriate. This is a federal court, not a state court." *Cooley v. Salopian Ind., Ltd.*, 383 F.Supp. 1114, 1116 (D.S.C.1974). Finding no such provision in federal law, this court rejects plaintiff's request for an election of remedies.[7]

---

**7.** Plaintiff cites South Carolina case law for the proposition that it is entitled to elect its remedies post-trial in this case. While this court posits that this is a procedural issue, properly governed by federal law, it finds that if South Carolina case law governed the issue, plaintiff's request would also be denied.

The doctrine of election of remedies involves a choice between two or more different and coexisting modes of procedure and relief afforded by law for the same injury. Its purpose is to prevent double redress for single wrong. Use of the doctrine is limited to cases where a double recovery by the plaintiff is threatened. When one set of facts entitles the plaintiff to alternative remedies, he may plead and prove his entitlement to both; however, the plaintiff may

## B. Plaintiff's Motion for Relief From Judgment

ERM objected to plaintiff's request for an election of remedies. ERM posits that because plaintiff did not file a timely Rule 59(e) motion, but chose to file a request for election instead, plaintiff should be denied relief.

### 1. Rule 59(e) Is Inapplicable

Rule 59(e) provides that: "[a] motion to alter or amend the judgment shall be filed no later than 10 days after entry of the judgment." The Fourth Circuit has held that "[w]hile the Rule itself provides no standard for when a district court may grant such a motion, we have previously recognized that there are three grounds for amending an earlier judgment: (1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." *Pacific Ins. Co. v. American Nat'l Fire Ins. Co.*, 148 F.3d 396, 402 (4th Cir.1998); *see also EEOC v. Lockheed Martin Corp., Aero & Naval Sys.*, 116 F.3d 110, 112 (4th Cir.1997); *Hutchinson v. Staton*, 994 F.2d 1076, 1081 (4th Cir.1993). Even if plaintiff filed a timely Rule 59(e) motion, none of the required grounds would be impacted. Ac-

cordingly, this court finds that a filing of a Rule 59(e) motion by plaintiff would have been inappropriate.

### 2. Rule 60(a) Dictates that this court correct a clerical mistake

Rule 60(a) provides that "[c]lerical mistakes in judgments ... arising from oversight or omission may be corrected by the court at any time of its own initiative or on the motion of any party and after such notice, if any, as the court orders." (West 2000). The rule further states that "during the pendency of an appeal, such mistakes may be so corrected before the appeal is docketed in the appellate court, and thereafter while the appeal is pending may be so corrected with leave of the appellate court." *Id.*

■ The jury's findings on the verdict form in this case mandate that this court enter a relief from judgment pursuant to Rule 60(a). The jury not only found that defendant violated the South Carolina Unfair Trade Practices Act, it found that defendant committed said violation willfully or knowingly. This finding dictates that this court treble damages and award plaintiff attorney's fees pursuant to S.C.Code Ann. § 39–5–140(a). It would have been imprudent for this court to enter a judg-

---

not recover both. The plaintiff should have a full opportunity to prove his claim to some form of relief, but he should not receive a double recovery.
*Cowart v. Poore*, 337 S.C. 359, 523 S.E.2d 182, 185 (1999) (citing *Tzouvelekas v. Tzouvelekas*, 206 S.C. 90, 33 S.E.2d 73 (S.C 1945)); Save *Charleston Foundation v. Murray*, 286 S.C. 170, 333 S.E.2d 60 (1985). The election of remedies doctrine may be used by the defendant or the trial judge. *See id.*

In the case at bar, Liberty Mutual was given the opportunity to prove its breach of contract and SCUTPA claims. It is important to note

that ERM conceded that there had been a breach of contract and only challenged the breach of contract cause of action as being barred by the statute of limitations and the amount of damages due to plaintiff. The jury found that this claim was not barred on statute of limitations grounds and also found for plaintiff on the unfair trade practices cause of action. There is no danger of a double recovery in this case. Moreover, the doctrine is to be used by defendants or judges, but not plaintiffs. Accordingly, it is not proper for this court to grant plaintiff's request for election.

ment on these issues prior to considering defendant's post-trial motions. Thus, the damages award of $956,592.08 is trebled and plaintiff is entitled to reasonable attorney's fees and costs incurred in the pursuit of these actions.

### C. Motion to Recover Attorneys' Fees & Costs

■ Under the American Rule, each party bears the costs of its own attorneys, and attorney's fees are generally not a recoverable cost of litigation unless a statute or agreement provides otherwise. *See Key Tronic Corp. v. United States,* 511 U.S. 809, 814–15, 114 S.Ct. 1960, 128 L.Ed.2d 797 (1994). The SCUTPA mandates that a court award attorney's fees and costs to a successful party. *See* S.C.Code Ann. § 39–5–140(a) ("[U]pon the finding by the court of a violation of this article [the SCUTPA], the court *shall* award to the person bringing such action under this section reasonable attorney's fees and costs."). As stated by South Carolina Supreme court in *Taylor v. Medenica:*

> The attorney's fees provision of § 39–5–140 is rationally related to the policy objectives of the UTPA. Allowing plaintiffs who successfully pursue an action under the UTPA to recover their attorney's fees encourages individuals to pursue litigation to protect the public interest. Similarly, requiring unsuccessful defendants to pay the plaintiff's attorney's fees discourages tradesmen from engaging in unfair methods of competition and unfair and deceptive acts in the conduct of trade or commerce, thereby also enforcing the purpose of the UTPA. We find the attorney's fees provision of the UTPA is a legitimate tool which supports the policy objectives of the statute. Consequently, the attorney's

fees provision does not violate equal protection.

503 S.E.2d at 460.

■ While the South Carolina Unfair Trade Practices Act mandates that the court award a successful plaintiff attorney's fees and costs, the determination of the amount and reasonableness of the attorney's fees award is the court's responsibility. *See Federal Deposit Ins. Corp. v. Aroneck,* 643 F.2d 164, 166 (4th Cir.1981). The party seeking recovery of attorneys' fees bears the burden of "[d]ocumenting the appropriate hours expended and hourly rates." *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). As a general rule, attorney's fees mandated by state statute are available in a diversity action. *See Cotton v. Slone,* 4 F.3d 176, 180 (2d Cir.1993) (citing *Alyeska Pipeline Service Co. v. Wilderness Soc.,* 421 U.S. 240, 259 n. 31, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975)). The Fourth Circuit has held that state law is ordinarily to be followed in determining whether attorney's fees are recoverable. *See Culbertson v. Jno. McCall Coal Co. Inc.,* 495 F.2d 1403, 1405–06 (4th Cir.1974), *cert. denied,* 419 U.S. 1033, 95 S.Ct. 516, 42 L.Ed.2d 308 (1974).

South Carolina courts have held that "there is no requirement that an attorney's fee be less than or comparable to a party's monetary judgment." *See Taylor,* 503 S.E.2d at 462. In fact, the South Carolina Supreme Court has approved an award of attorney's fees where the fee exceeded the actual recovery by approximately $10,000. *See Baron Data Systems, Inc. v. Loter,* 297 S.C. 382, 377 S.E.2d 296, 298 (1989). In light of the foregoing, this court awards plaintiff costs and attorney's fees based on the fact that plaintiff was successful at trial on its SCUTPA cause of action.

"In calculating an award of attorney's fees, the Court usually should determine a lodestar figure by multiplying the number of reasonable hours expended times a reasonable rate." *See Brodziak v. Runyon*, 145 F.3d 194, 196 (4th Cir.1998) (citing *Daly v. Hill*, 790 F.2d 1071, 1077 (4th Cir.1986)). The resulting "lodestar" figure is then considered to be the reasonable fee in the case. *See Blum v. Stenson*, 465 U.S. 886, 895 n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *EEOC v. Service News Co.*, 898 F.2d 958, 965 (4th Cir.1990). In addressing the reasonableness of the fee award, the court must adhere to the Supreme Court's mandate that "[a] request for attorney's fees should not result in a second major litigation." *Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40(1983).

■ In order to determine the reasonableness of the fee request, the court considers the twelve (12) factors first set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974):

(1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

*Brodziak*, 145 F.3d at 196; *Service News Co.*, 898 F.2d at 965 (4th Cir.1990); *Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 n. 28 (4th Cir.1978), *cert. denied*, 439 U.S. 934, 99 S.Ct. 329, 58 L.Ed.2d 330 (1978). The Fourth Circuit has held that there is no strict manner in which these twelve *Johnson* factors are to be considered and applied. *See Service News Co.*, 898 F.2d at 965. Likewise, a district court is under no obligation to go through the inquiry of those factors that do not fit the circumstances of the particular case for which fees are sought. *See In re A.H. Robins Co., Inc.*, 86 F.3d 364, 376 (4th Cir.1996), *cert. denied*, 519 U.S. 993, 117 S.Ct. 483, 136 L.Ed.2d 377 (1996). Nevertheless, "*Johnson* expressly contemplates that these factors be used both in calculating the hourly rate and the reasonable number of hours expended on a case." *See Trimper v. City of Norfolk*, 58 F.3d 68, 76 (4th Cir.1995), *cert. denied*, 516 U.S. 997, 116 S.Ct. 535, 133 L.Ed.2d 440 (1995).

**1. Computation of Reasonable Hourly Rate**

"The first step in setting a reasonable fee is determining the appropriate hourly rate." *Plyler v. Evatt*, 902 F.2d 273, 277 (4th Cir.1990). The reasonableness of the attorney's hourly rate is determined by the "prevailing market rates in the relevant community.'" *Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 175 (4th Cir. 1994) (quoting *Blum v. Stenson*, 465 U.S. 886, 895, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)). "The court must assess the experience and skill of the prevailing parties' attorneys and compare their rates to the rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Alexander S. v. Boyd*, 929 F.Supp. 925, 935 (D.S.C.1995) (citing *Blum*, 465 U.S. at 895

n. 11, 104 S.Ct. 1541). The following *Johnson* factors should be used to determine the appropriate hourly rate: two, three, four, five, eight, nine, and ten.

## A. Reasonable Hourly Rate

### (1) Novelty & Difficulty of the Question Raised

The second *Johnson* factor requires the Court to review the novelty and difficulty of the questions raised. Much of the law involved in this case (e.g., breach of contract, construction of insurance policy language, and analysis of statutes of limitation) was, in and of itself, no more or less difficult than that found in many commercial cases. However, the SCUTPA issues in this case were unique and difficult. The case presented novel issues of law because it required counsel to apply "standard" commercial law principles to obscure workers' compensation statutes, regulations and insurance standards that are almost never addressed, much less litigated, in the course of an ordinary commercial case.

This case was complex. Plaintiff reconstructed an audit of the 1994 Policy that ERM had attempted to frustrate. Because ERM was a staff leasing company with diverse clients in numerous states, in order to verify (or complete) ERM's records, plaintiff sought extensive document production from ERM's clients and former agents which included having to obtain records held by the FBI. Plaintiff also reviewed and categorized an estimated 30,-000 documents in order to prepare for trial.

Preparing for trial involved finding and preparing witnesses who could explain to the jury the following complicated issues: (i) the nature of the staff leasing business in general; (ii) the components of the South Carolina Workers' Compensation Assigned Risk Plan; (iii) the method by which workers' compensation premiums are calculated, particularly with respect to experience modification ratings and other factors applicable to staff leasing companies; (iv) the manner in which cancellation of a workers' compensation policy becomes effective; (v) audit procedures and processes used by Liberty Mutual to calculate final premiums; (vi) the methods in which a staff leasing insured can defraud a workers' compensation insurance company; (vii) the adverse public impact occasioned by employers who deceive their workers' compensation carriers; (vii) the history of Liberty Mutual's and ERM's often strained relationship; (viii) how ERM's conduct during the audit process frustrated Liberty Mutual's ability to determine the nature and extent of ERM's deceptive business practices; and (ix) the manner in which ERM deceived other workers' compensation carriers. Finally, plaintiff had to present the witnesses and evidence at trial in a manner in which the jury could not only understand but find compelling. Obviously, plaintiff's attorneys succeeded in their presentation to the jury.

### (2) Skill required to properly perform the legal services rendered

In *Alexander S.*, Judge Joseph F. Anderson held that: "[t]he third *Johnson* factor requires the court to consider the skill required to properly perform the legal services rendered. In determining this, the court must determine whether the case presented plaintiffs' counsel with novel or complicated issues." 929 F.Supp. 925, 936 (D.S.C.1995). As discussed above, some of the legal issues in the case were both "novel" and complicated. *See Taylor v. Medenica*, 331 S.C. 575, 503 S.E.2d 458, 461 (1998) (affirming trial court's award of

attorney's fees following a SCUTPA verdict in which the trial court opined that "UTPA actions were one of the most difficult types of cases to try").

At trial, plaintiff's counsel was required, *inter alia*, to: (i) present evidence detailing the relationship between a workers' compensation insurance carrier, a staff leasing company insured and the South Carolina Workers' Compensation Assigned Risk Plan; (ii) demonstrate to the jury that the insurance carrier was not acting unfairly or overreaching, as vigorously alleged by Defendants; (iii) show that the Defendant ERM, by and through its agents, officers and employees, not only breached its contract with Liberty Mutual, but also committed unfair and deceptive acts and practices in furtherance of a scheme to deprive Liberty Mutual of its rightful premium; (iv) explain to the jury complicated premium calculation and auditing principles impacted by ERM's actions; and (iv) withstand defenses premised on, among others, statute of limitations, provisions of the applicable insurance policies, and shifting analysis of South Carolina Workers' Compensation statutes and regulations.

Over the course of an eight-day trial, defendants were able to call on four attorneys to share the burden of actually trying the case. Only one lawyer (Mr. Morrison) presented the entire case-in-chief to the jury on Liberty Mutual's behalf.

Plaintiff used both local counsel (Mr. Morrison/Moore & Van Allen and Holmes & Thomson) and national counsel (Ms. Szymoniak/Szymoniak Law Firm). Ms. Szymoniak, through her prior representation of Liberty Mutual in premium fraud actions, was uniquely qualified to direct the extensive pre-litigation investigation and conduct the majority of the pre-trial discovery document reviews, which were essential to plaintiff in order to develop the case. Mr. Morrison, a seasoned Charleston trial attorney with significant federal court experience, was also well-qualified to oversee the litigation. Mr. Morrison acted as plaintiff's lead counsel throughout the litigation and personally handled and/or supervised every court appearance.

Defendant ERM also used both national counsel (Edward Fisher) and local counsel (W. Jefferson Leath, Jr.) and Mr. Leath, like Mr. Morrison, acted as defendants' lead counsel up to and during the trial of the case. Where the litigation is sufficiently complex to support the participation of both local and national counsel, both are important to the success of the plaintiff's claim, and attorneys' fees can be awarded to both. *See Rehabilitation Ass'n of Virginia, Inc. v. Metcalf,* 8 F.Supp.2d 520, 529 (E.D.Va.1998). This court finds that both national and local counsel were important to the success of plaintiff's case.

### (3) Attorney's opportunity costs in pressing the instant litigation

The fourth *Johnson* factor addresses whether counsel was "forced to forego other legal work at the same billing rates in order to concentrate on the action." *ABC, Inc. v. Primetime,* 67 F.Supp.2d 558, 565 (M.D.N.C.1999). In *Alexander S. v. Boyd,* Judge Joseph F. Anderson, Jr. found that participation in numerous court proceedings denies counsel the opportunity to work on other fee-producing cases. *See* 929 F.Supp. 925, 936 (D.S.C.1995). Here, based on the length and complexity of the discovery, pre-trial preparation and trial, as demonstrated by counsel's time entries, it necessarily follows that plaintiff's counsel was unable to perform work for other clients. No adjustment to the hourly rate

requested by plaintiff's counsel or to the lodestar figure is warranted based on the fourth *Johnson* factor.

### (4) Customary fee for like work

The fifth *Johnson* factor requires the Court to consider the customary fee for like work. In making this determination, the court should consider various information, including affidavits, recent fee awards in comparable cases and "specific evidence of counsel's actual billing practice or other evidence of actual rates which counsel can command in the market." *Buffington v. Baltimore County,* 913 F.2d 113, 130 (4th Cir.1990), *cert. denied,* 499 U.S. 906, 111 S.Ct. 1106, 113 L.Ed.2d 216 (1991). As discussed above, the court has the discretion to make factual findings based on personal knowledge of the prevailing rates in the relevant market. *See Rum Creek Coal Sales,* 31 F.3d at 179.

In the instant case, plaintiff seeks recovery of attorney's fees at the precise hourly rates actually charged to, and paid by, Liberty Mutual. The requested rates, as set forth below, reflect plaintiff's counsel's normal, ordinary and customary rates for similar complex litigation and, in fact, "reflect counsel's actual billing practice" for this lawsuit, which operates strongly in favor of a finding that the rates are *per se* reasonable. *Alexander S.,* 929 F.Supp. at 937. It is also noted that defendant has not objected to the rates charged by plaintiff's attorneys.

Billing records of Holmes & Thomson, LLP demonstrate that Mr. Morrison charged Liberty Mutual a fee of $175.00 per hour from March, 1998 through April, 1999. Danny H. Mullis, Esquire, who was Mr. Morrison's partner at Holmes & Thomson and assisted him in the case, also charged a fee of $175.00 per hour. Paralegal time was billed at $75.00 per hour.

Billing records of Moore & Van Allen, PLLC, show that Mr. Morrison's rate stayed at $175.00 per hour until May 2000, when it increased to $185.00 per hour. Moore & Van Allen associates who assisted Mr. Morrison, including Robert Varnado and Richard Burke, billed Plaintiff at $150.00 per hour. Paralegal time at Moore & Van Allen was billed at $70.00 per hour. Similarly, Szymoniak Law Firm billing records demonstrate that partners in the firm charged $190.00 per hour; associates charged between $150.00 and $175.00 per hour; non-lawyer investigators billed $125.00 per hour; and paralegal time was billed at $85.00 per hour.

The fees requested above are reasonable, both in the local community (i.e., the District of South Carolina), as well as in Florida (where the Szymoniak Firm is located). While the court generally finds the fees charged are reasonable, it will reduce the rate charged by Moore & Van Allen for summer associates from $90.00 per hour to $65.00 an hour, the average hourly rate of a paralegal in this district.

### (5) The Attorney's Expectations at the Outset of Litigation

The sixth *Johnson* factor, which generally implicates contingent fee arrangements, is irrelevant in the instant case because plaintiff's counsel did not have a contingency agreement with Liberty Mutual and "contingency multipliers may not be allowed in statutory fee cases." *Lucas v. Guyton,* 901 F.Supp. 1047, 1057 n. 1. (D.S.C.1995) (citing *Sheppard v. Riverview Nursing Centre,* 870 F.Supp. 1369, 1380 (D.Md.1994)).

### (6) Amount in controversy and the results obtained

"The most critical factor in calculating a reasonable fee award is the degree of suc-

cess obtained." *Brodziak v. Runyon,* 145 F.3d at 196, 197 (citing *Hensley v. Eckerhart,* 461 U.S. 424, 436, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)); *Farrar v. Hobby,* 506 U.S. 103, 114–15, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992). Thus, the eighth Johnson factor is entitled to great weight in the attorney's fee calculation in this case.

In the instant case, the amount in controversy has always approached one million dollars in actual unpaid premiums. On September 22, 1995, Liberty Mutual calculated the final amount of earned premium due on the 1994 Policy to be $1,377,934 and invoiced ERM for this amount; because ERM made two payments of $42,538.75 each during the 1994 Policy year, Liberty Mutual calculated that ERM owed Liberty Mutual a balance of $1,293,551.50. This was the amount of actual damages sued upon in Count I of the Complaint. During the course of litigation, plaintiff adjusted its this figure downward—in effect, giving ERM credit after plaintiff finally was able to review records which ERM withheld during the audit on the 1994 Policy. Before trial, Liberty Mutual filed and served an amended complaint seeking $957,128.00 plus pre-judgment interest. Moreover, at trial Liberty Mutual asked for—and received—a verdict of $956,953.08.

Likewise, the favorable result obtained by plaintiff's counsel is obvious; Liberty Mutual received an actual damages award $956,953.00, which was only $174.92 less than requested in the amended complaint's prayer for relief. Plaintiff not only recovered on its breach of contract claim, but succeeded in convincing the jury that ERM had willfully violated the SCUTPA's prohibition against unfair and deceptive methods, acts, and trade practices, allowing plaintiff to recover treble damages and

its attorney's fees and costs. In light of the facts that ERM: (1) refused to pay Liberty Mutual more than $85,077.50 in premiums on the 1994 Policy; (2) engaged in a scheme to deprive Liberty Mutual of premiums due; (3) forced Liberty Mutual to engage in months of investigation and almost two years of federal court litigation to protect its rights; and (4) never admitted that it owed Liberty Mutual more than $250,000.00, plaintiff's counsel clearly obtained a favorable result.

### (7) Experience, reputation and ability of the attorney

The ninth *Johnson* factor requires the Court to consider the reputation, experience and ability of the attorneys involved. Affidavits submitted by plaintiff's principal attorneys, Mr. Morrison and Ms. Szymoniak, regarding their biographical information; reveal these attorneys' experiences, reputations, and abilities.

### (8) Undesirability of the case

While this was an difficult case, in terms of both complexity and preparation, it was not *per se* undesirable. Thus, the tenth *Johnson* factor will be deemed a neutral factor that will not affect the award of fees in this case.

### B. Analysis of Reasonable Number of Hours

After determining the reasonable hourly rate, the Court must next determine what constitutes a reasonable number of hours. *See Trimper,* 58 F.3d at 76. In so doing, it has been held that the court will pay close attention to the detailed bill submitted by plaintiff's counsel recognizing that:

> [c]ounsel for a party statutorily entitled to recover attorney's fees must exercise

billing judgment and exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary. Hours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority.

*Lucas,* 901 F.Supp. at 1058 (quoting *Hensley,* 461 U.S. at 434, 103 S.Ct. 1933). This court has previously found that *Johnson* factors one, two, three, seven, eight, nine, eleven and twelve are relevant to the analysis of the reasonable number of hours billed. *See id.* The court again notes that defendant has not objected to the number of hours billed by plaintiff's attorneys.

### (1) Time and labor required

Plaintiff submitted affidavits from Mr. Morrison, as well as Ms. Szymoniak and the managing partner of her firm, Mr. Cullen, that they personally reviewed their bills. · Two independent attorneys, Mr. Wills (Charleston, SC) and Mr. Hutchison (Boca Raton, FL) also reviewed the invoices and deemed them to be consistent with the demands of the case. This court finds that the hours charged by plaintiff's attorneys and their staffs are reasonable expenditures of time.

### (2) Novelty and difficulty of questions

This case presented some novel and difficult questions of law and fact. The invoices submitted by plaintiff adequately reflect the hours spent in research, drafting and trial preparation necessary to demonstrate this point.

### (3) Skill required to properly perform the legal services

The hours expended by plaintiff's counsel are reasonable for attorneys of their respective levels of skill and experience.

### (4) Time limitations imposed by the client or circumstances

Plaintiff conceded that there were no unduly burdensome or extraordinary time constraints imposed by the litigation in this case. Thus, the seventh *Johnson* factor is neutral to the instant analysis and there is no basis to adjust the requested fees upward or downward.

### (5) Amount in controversy and results obtained

The amount in controversy in this case has always been significant—as demonstrated by the jury's actual damages award and finding of a willful violation of the SCUTPA by ERM. The requested attorney's fees are reasonable in light of the results obtained on the SCUTPA cause of action. Plaintiff is entitled to treble damages in this case pursuant to the provisions of S.C.Code Ann. § 39–5–140(a). Thus, plaintiff will recover damages in the amount of $2,870,859.00, exclusive of prejudgment interest. Plaintiff's fee request is less than one-third of the entire judgment amount due and owing by ERM to plaintiff, which would be in line with a contingency award had plaintiff and its counsel entered into such an agreement.

### (6) Experience, reputation and ability of the attorney

The hours spent on this case by plaintiff's attorneys are commensurate and reasonable in light of their respective levels of experience as compared to those that would have been spent by other attorneys of comparable experience.

### (7) Nature/length of the professional relationship between attorney & client

This was the first time the attorney at both Holmes & Thomson and Moore &

Van Allen represented Liberty Mutual. The Eastern District of Virginia has opined that a new attorney-client relationship permits the reasonable assumption, that, in general, significant time be devoted to trial preparation. *See Estes v. Meridian One Corp.*, 77 F.Supp.2d 722, 728 (E.D.Va.1999).

By contrast, Ms. Szymoniak and the attorneys at her firm have a long-standing professional relationship with Liberty Mutual. Regardless of the differences in their relationship with Liberty Mutual, this was a difficult case to prepare and prosecute to verdict.

At bottom, there is nothing unusual about the length of counsels' respective relationship with Liberty Mutual that would warrant a downward adjustment from their requested hourly rates. Moreover, at least one district court has found that when an attorney has performed work for a client in the past, and the client has previously paid the same customary rates charged by the attorney, that evidence weighs in favor of a finding that the fees sought are reasonable. *See ABC, Inc. v. Primetime*, 67 F.Supp.2d 558, 565 (M.D.N.C.1999). This court finds that the requested fees are reasonable in light of the fees charged in Charleston and the relationship Szymoniak had with Liberty Mutual.

**(8) Awards in Similar Cases**

There are few reported South Carolina decisions, either from state or federal courts, which would demonstrate comparable awards in the relevant community on SCUTPA claims. In 1998, the South Carolina Supreme Court affirmed an award of $500,000.00 in attorney's fees in a SCUTPA claim against a medical laboratory, where the plaintiff's trebled damages were $108,726.00. *See Taylor v. Medenica*, 331 S.C. 575, 503 S.E.2d 458, 460–1 (1998). Also, in *Global Protection Corp. v. Halbersberg*, 332 S.C. 149, 503 S.E.2d 483, 489 (1998.), the Court awarded attorney's fee in the amount of $311,819.89 where actual damages (before they were trebled) were $354,207.05.

The following reflects the fees submitted by plaintiff:

### Holmes & Thomson, LLP

(Time Entries from March 25, 1998 through April 26, 1999)

| Timekeeper: | Rate: | Hours | Amount |
|---|---|---|---|
| Wm. Howell Morrison | $175.00/hr | 112.10 | $ 19,617.50 |
| Danny H. Mullis | $175.00/hr | 117.40 | $ 20,545.00 |
| Paralegal | $ 75.00/hr | 34.60 | $ 2,595.00 |

**Holmes & Thomson:** **Subtotal:** $ 42,757.50

### Moore & Van Allen, PLLC

(Time Entries from May 5, 1999 through June 30, 2000)

| Timekeeper: | Rate: | Hours | Amount |
|---|---|---|---|
| Wm. Howell Morrison | $175.00/hr | 581.34 | $ 101,734.50 |
| Wm. Howell Morrison | $185.00/hr | 420.10 | $ 77,718.50 |
| Robert B. Varnado | $150.00/hr | 434.60 | $ 65,190.00 |
| Richard C. Burke | $150.00/hr | 96.10 | $ 14,415.00 |
| Phyllis W. Ewing | $150.00/hr | 15.30 | $ 2,295.00 |
| Benjamin P. Glass | $150.00/hr | 3.79 | $ 568.50 |
| Trudy H. Robertson | $150.00/hr | 2.10 | $ 315.00 |
| Thomas Waring | $185.00/hr | .90 | $ 166.50 |
| Elizabeth T. Thomas | $190.00/hr | .60 | $ 114.00 |
| **Summer Associate** | **$ 90.00/hr** | 47.90 | $ 4,311.00 |
| Paralegal—Anderson/Sessoms | $ 70.00/hr | 773.51 | $ 54,145.70 |
| Paralegal—McKenzie | $ 65.00/hr | .70 | $ 45.50 |
| Paralegal—Anson | $ 60.00/hr | 20.50 | $ 1,230.00 |

**Moore & Van Allen Subtotal:** $322,249.20

**Szymoniak Firm, P.A.**

(Time Entries from February 3, 1998 through June 30, 2000)

| Timekeeper: | Rate: | Hours | Amount |
|---|---|---|---|
| Lynn Szymoniak | $190.00/hr | 1,856.90 | $ 352,811.00 |
| Scott Topolski | $175.00/hr | 40.00 | $ 7,000.00 |
| Scott Topolski | $190.00/hr | 56.00 | $ 10,640.00 |
| Mary O'Donnell | $175.00/hr | 152.50 | $ 26,687.50 |
| Mary O'Donnell | $190.00/hr | 5.70 | $. 1,083.00 |
| Mark Cullen | $190.00/hr | 42.10 | $ 7,999.00 |
| Michael Morris | $150.00/hr | 65.20 | $ 9,780.00 |
| James Lyles | $125.00/hr | 166.50 | $ 20,812.50 |
| Laura Perlstock | $125.00/hr | 73.00 | $ 9,125.00 |
| Paralegal | $ 85.00/hr | 886.90 | $ 75,386.50 |

**Szymoniak Firm, P.A. Sub Total:** $521,324.50

**TOTAL:** $886,331.20

This court finds that the fees charged to the client for summer associate billing at Moore & Van Allen, PLLC are excessive. Accordingly, this court reduces the $90.00 rate charged to Liberty Mutual to $65.00 for summer associate research and analysis, the average rate of a paralegal in this community. Thus, the amount awarded to plaintiff for the costs of summer associate billing is reduced from $4,311.00 to $3113.50. Thus, the total amount of attorney's fees awarded to plaintiff is $885,133.70

## (D) COSTS

Plaintiff also seeks recovery of its costs pursuant to S.C.Code Ann. § 39–5–140(a). Documentary support for costs in the amount of $41,127.30 billed to plaintiff by were submitted to the court.[8] While ERM has generally objected to any SCUTPA damages being awarded to plaintiff in this case, it has not specifically objected to plaintiff's submission of costs. Accordingly, this court awards plaintiff $41,127.30 in costs.

## (E) PREJUDGMENT INTEREST

Liberty Mutual Insurance Company requests that this court award prejudgment interest at the rate of 8.75 % per annum, in accordance with S.C.Code Ann. § 34–31–20.

State law governs an award of prejudgment interest in a diversity action. *See Hitachi Credit America Corp. v. Signet Bank,* 166 F.3d 614, 633 (4th Cir.1999) "The law allows prejudgment interest on obligations to pay money from the time when, either by agreement of the parties or operation of law, payment is demandable, if the sum due is certain or capable of

being reduced to certainty." *APAC Carolina, Inc. v. Town of Allendale, South Carolina,* 41 F.3d 157, 165 (4th Cir.1994) (citing *Babb v. Rothrock,* 310 S.C. 350, 426 S.E.2d 789, 791 (1993)). Specifically, South Carolina Code § 34–31–20(a) provides for an award of prejudgment interest on obligations to pay money, "in all cases of accounts stated and in all cases wherein any sum or sums of money shall be ascertained and, being due, shall draw interest according to law, the legal interest shall be at the rate of eight and three-fourths percent per annum." (Law Co–Op 2000). This court has held that under South Carolina law, "[o]rdinarily, the use of the word 'shall' in a statute means that the action referred to is mandatory." *Holt v. State Farm Mut. Auto. Ins. Co.,* 870 F.Supp. 658, 664 (D.S.C.1994) (citing *South Carolina Dep't of Highways and Public Transp. v. Dickinson,* 288 S.C. 189, 341 S.E.2d 134, 135 (1986)). When a statute is clear and explicit, there is no room for construction by the court, and the court "must therefore apply it literally. Taken literally, the word 'shall' is mandatory." *Holt,* 870 F.Supp. at 664 (citing *State v. Foster,* 277 S.C. 211, 284 S.E.2d 780 (1981)). The General Assembly used the word "shall" twice in § 34–31–20(a). A plain reading of the statute indicates that prejudgment interest shall be awarded on ascertainable amounts of money that are due and owing, and that the rate shall be at 8.75%. The statutory language is unambiguous and, accordingly, mandates an award of prejudgment interest in this matter.

"As a general rule, prejudgment interest is not appropriate when a plaintiff seeks to recover unliquidated

---

**8.** Holmes & Thomson billed plaintiff $557.70 for costs.

 Moore & Van Allen billed plaintiff $8,660.95 for costs.

 Szymoniak & Ridge billed plaintiff $31,908.65 for costs.

damages." *APAC Carolina, Inc. v. Town of Allendale, South Carolina,* 41 F.3d 157, 165 (4th Cir.1994). However, "the fact that the sum due is disputed does not render the claim unliquidated for the purposes of an award of prejudgment interest." *Babb v. Rothrock,* 310 S.C. 350, 426 S.E.2d 789, 791 (1993); *Wayne Smith Construction Co., Inc. v. Wolman, Duberstein and Thompson,* 294 S.C. 140, 363 S.E.2d 115 (1987). "The proper test for determining whether prejudgment interest may be awarded is whether or not the measure of recovery, not necessarily the amount of damages, is fixed by conditions existing at the time the claim arose." *Babb,* 426 S.E.2d at 791 (citing 47 C.J.S. *Interest & Usury* § 49 at 124–25 (1982)). When an otherwise unliquidated claim is capable of being reduced to certainty by a simple mathematical calculation, it can be considered liquidated for the purpose of awarding prejudgment interest. *See Builders Transport, Inc. v. South Carolina Prop. & Cas. Ins. Guar. Ass'n,* 307 S.C. 398, 415 S.E.2d 419, 424 (1992).

ERM claims that the premium amounts it admittedly owed Liberty Mutual were not demandable, primarily because ERM claims Liberty Mutual intermingled its breach of contract and SCUTPA claims. However, at trial, ERM conceded that (i) that the 1994 policy was a binding contract of insurance between ERM and Liberty Mutual; and (ii) that ERM owed Liberty Mutual additional premium as a result of that insurance policy.

Under the terms of the 1994 policy, ERM owed Liberty Mutual an obligation to pay the full amount of premium, as calculated by the audit. There is no question that premium was demandable under the 1994 Policy. Liberty Mutual clearly proved that the measure of recovery was fixed by conditions existing at the time the claim arose.

As to the requirement that the demandable amount was certain or capable of being reduced to certainty, plaintiff proved that the amount was capable of being reduced to certainty. Liberty Mutual's expert, Robert Tipton, testified that the formula by which a workers' compensation premium is calculated is fairly simple: following audit by the carrier, the NCCI mandated rate for each employee classification is factored in against the employer's total payroll, and then adjusted up or down based on the employer's recent claims experience ("experience modifier"). In the case of assigned risks, there is an additional modifying factor, the ARAP. The actual calculation involves simple arithmetic.

At trial, the parties did not dispute Mr. Tipton's methodology. Accordingly, this court finds that the amount of premium due and owing to Liberty Mutual was capable of being reduced to certainty. Thus, under the provisions of S.C.Code § 34–31–20, interest would accrue from October 22, 1995 to June 28, 2000 at the rate of 8.75 % per annum. Thus, this court awards Liberty Mutual prejudgment interest in the amount of Three Hundred Eighty–Five Thousand One Hundred Forty–Five and $^{00}/_{100}$ ($385,145.00) Dollars.

### III. Individual Defendants' Post–Trial Motion

Defendants Attaway, Berman, King, Rand, & Yountz's request their costs and attorneys' fees for defense of the RICO actions brought by Liberty Mutual against them. Counts III and IV of the Complaint set forth causes of action against the individual Defendants, William F. Attaway, Robert Berman, William E. King, III, Robert T. Rand, and Kelli Yountz ("Indi-

vidual Defendants") under § § 1962(a) and 1962(c) of the Racketeering Influenced and Corrupt Organizations Act ("RICO"). On February 23, 2000, ERM and the Individual Defendants filed on Offer of Judgment Pursuant to Rule 68. ERM and the Individual Defendants offered "to allow judgment to be taken against them in this action" in the amount of $100,000. Plaintiff rejected the offer.

On February 25, 2000, Individual Defendants moved for summary judgment on Counts III & IV of Plaintiff's Complaint. At the May 18, 2000 hearing on the parties' cross-motions for summary judgment, the Court granted Individual Defendants' summary judgment motion as to the § 1962(a) RICO cause of action. (May 23, 2000 Order, at pp. 2–3) The trial commenced on June 12, 2000. At the conclusion of Defendants' case-in-chief, the Court granted the Individual Defendants' Rule 50 motion with regard to the § 1962(a) RICO cause of action. (Judgment Dated 6/29/2000). The Individual Defendants now move pursuant to Federal Rules of Civil Procedure 54(d) and 68 and 18 U.S.C. § 1964(c) for an Order awarding them attorney's fees and costs incurred in their defense of this case.

### (A) Costs

Plaintiff concedes that the Individual Defendants are "prevailing parties" with respect to the RICO causes of action. Accordingly, the Individual Defendants are entitled to recover their taxable costs pursuant to Rule 54(d)(1). Individual Defendants incurred costs in the defense of this matter in the total amount of $32,625.50. Plaintiff has not objected to this amount.

### (B) Attorney's Fees

Individual Defendants contend that as the "prevailing parties" on the RICO cause of action, they are entitled to recover at-torney's fees alternatively under (i) § 1964(c) of the RICO statute; (ii) Rule 54(d); and/or (iii) Rule 68. This court finds that Individual Defendants are not entitled to recover attorney's fees under any of these theories.

### (1) Section 1964(a) of the RICO Statute

Section 1964(a) provides that "any person injured in his business or property by reason of a violation of section 1962(a) of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of suit, including a reasonable attorney's fees." 18 U.S.C. § 1964(c). Applying the plain language of the statute, a RICO defendant cannot recover its attorney's fees because a defendant cannot be a person injured in his business or property by racketeering activity. *See* 18 U.S.C. § 1964(c). As stated by one RICO commentator, Section 1964(c) is a "mandatory, one-way fee-shifting provision", in which "only plaintiffs who obtained judgments on the merits may receive fees." Berger, *Civil Rico: A Definitive Guide* 153 (2d ed. ABA 2000).

The Ninth Circuit has held that "prevailing defendants cannot recover attorneys' fees pursuant to § 1964(c) of the RICO statute because they were prevailing defendant in this action. That provision only permits prevailing plaintiffs to recover fees." *Chang v. Chen,* 95 F.3d 27, 28 (9th Cir.1996) (citing 18 U.S.C. § 1964(c); *Religious Technology Ctr. v. Wollersheim,* 796 F.2d 1076, 1082–83 (9th Cir.1986), *cert. denied,* 479 U.S. 1103, 107 S.Ct. 1336, 94 L.Ed.2d 187 (1987)). Although there are no Supreme Court or Fourth Circuit Court of Appeals cases addressing the issue raised in *Chang,* the Ninth Circuit's reasoning is applicable to the instant case. In

spite of the fact that the Individual Defendants are prevailing parties in the RICO action, § 1964(c) does not warrant granting them attorney's fees. They are not precluded, however, from asserting other grounds for recovery of attorney's fees as long as those grounds are independent of the RICO statute. *See* 95 F.3d at 28 ("Courts have never construed [Section 1964(c) ] of the RICO statute as precluding a prevailing defendant from recovering attorneys' fees when authorized elsewhere.").

### (2) Rule 68

Individual Defendants contend that they are entitled to recover costs under Rule 68 because plaintiff rejected their February 23, 2000, offer of judgment and failed to win a "more favorable" RICO award. (Individual Defendants' Memo at p. 2) The Individual Defendants have been awarded costs under Rule 54(d)(1), therefore, their Rule 68 arguments for costs are now rendered moot.

As to their arguments for recovery of attorney's fees under Rule 68, Rule 68 provides that "[i]f the judgment finally obtained by the offeree is not more favorable than the offer, the offeree must pay the costs incurred after the making of the offer." The Offer of Judgment dated February 23, 2000, read as follows:

Now come Defendants Employee Resource Management, Inc.; William Attaway, Jr., Robert Berman, William E. King, III, Robert T. Rand, and Kelli Yountz, by and through their attorneys, and submit the following offer of judgment:

Pursuant to Rule 68 of the Federal Rules of Civil Procedure, Defendants hereby offer to allow judgment to be taken against them in this action, in the amount of One Hundred Thousand Dollars ($100,000.00) which sum shall be

include attorney's fees, together with costs accrued to date. This offer is made for the purposes specified in Rule 68 and is not to be construed as an admission that the Defendants are liable in this action or that the Plaintiff has suffered any damage.

ERM and the Individual Defendants collectively made an Offer of Judgment to plaintiff. At trial, plaintiff obtained a judgment that was $856,592.08 more favorable to it than the February 23, 2000. Once trebled, this judgment was $ 2,770,-859.00 more favorable than the Offer of Judgment. Thus, this court denies Individual Defendants' motion for attorney's fees under Rule 68.

## IV. CONCLUSION

It is therefore,

**ORDERED**, for the foregoing reasons that defendant's Motions for a Judgment as a Matter of Law, or in the alternative New Trial, and in the alternative, for a New Trial *Nisi Remittitur* are **DENIED**.

**IT IS FURTHER ORDERED** that,

Plaintiff's Request for an Election of Remedy is **DENIED**.

**IT IS ORDERED** that,

Plaintiff's Motion for Relief from Judgment is **GRANTED**.

**IT IS ALSO ORDERED** that,

Plaintiff's Motion for Attorney's Fees and Costs is **GRANTED**.

**IT IS ORDERED** that,

Plaintiff's Motion for an award of prejudgment interest is **GRANTED**.

**IT IS FURTHER ORDERED** that,

Individual Defendants' Motion for Attorney's Fees and Costs is **GRANTED IN**

PART AND DENIED IN PART.[9]

## V. JUDGMENTS

**IT IS ORDERED** that judgment be and the same is hereby entered for plaintiff in the amount of $2,870,859.00 for damages under the SCUTPA.

**IT IS FURTHER ORDERED** that judgment be and the same is hereby entered for plaintiff in the amount of $ 885,133.70 for attorney's fees.

**IT IS ORDERED** that judgment be and the same is hereby entered for plaintiff in the amount of $41,127.30 for costs incurred in this litigation.

**IT IS FURTHER ORDERED** that judgment be and the same is hereby entered for plaintiff in the amount of $385,145.00 for prejudgment interest.

**Plaintiff's TOTAL AWARD IS $4,182,265.00**

**IT IS ORDERED** that judgment be and the same is hereby entered for Individual Defendants in the amount of $32,625.50 for their costs incurred as a result of this litigation.

**Individual Defendants' TOTAL AWARD IS $32,625.50.**

**AND IT IS SO ORDERED.**

---

**9.** This court grants Individual Defendants' motion with regard to costs as proper under Rule 54, but denies their motion as to attorney's fees incurred in the defense of this action.